William ANDREWS, Plaintiff,

v.

Lawrence MORRIS, Warden of the Utah State Prison, Defendant.

Pierre Dale SELBY, aka Dale S. Pierre, Plaintiff,

v.

Lawrence MORRIS, Warden of the Utah State Prison, Defendant.

Nos. 18230, 18234.

Supreme Court of Utah.

Nov. 16, 1983.

Timothy K. Ford, Seattle, Wash., Parker Nielson, Salt Lake City, for Andrews.

D. Gilbert Athay, Salt Lake City, for Selby.

David L. Wilkinson, Atty. Gen., Robert Wallace, Asst. Atty. Gen., Salt Lake City, for defendant.

DURHAM, Justice:

The petitioners in these two cases, which have been consolidated for disposition, have filed essentially identical original petitions for postconviction review in this Court pursuant to U.C.A., 1953, § 78–2–2 and Rule 65B Utah R.Civ.P. Both petitioners were in the process of seeking disposition on petitions for writs of habeas corpus in the United States District Court for the District of Utah when this Court issued its opinion in the case of *State v. Wood,* Utah, 648 P.2d 71 (1982). Consideration of those petitions was stayed by the federal district court "pending a decision in the state courts as to whether or not *State v. Wood* ... will result in reversal of petitioners' sentences of death."

The petitioners now argue before this Court that the Utah and federal constitutions require the reversal of their sentences of death because the *Wood* standard for jury deliberations in the penalty phase of a capital case must be applied retroactively to them to avoid violations of their state and federal constitutional rights to due process and equal protection. The State responds by arguing that: (1) the issues raised by petitioners have either been waived or have already been adjudicated by this Court; (2) *Wood* should not be applied retroactively to petitioners' cases; (3) if this Court determines to apply *Wood* retroactively to petitioners, the error resulting from a failure to give a *Wood* instruction at their sentencing hearings was harmless; (4) the allegation that petitioners' sentences are arbitrary, capricious, and a denial of equal protection should be dismissed as a

matter of law; and (5) if this Court holds *Wood* retroactive and decides there was prejudicial error in the penalty phases of petitioners' trials, petitioners should be resentenced under U.C.A., 1953, § 76–3–207(4), which was amended on February 16, 1982, after these petitions were filed.

The petitioners appear in this Court for the third time. Five opinions have been issued related to their direct appeals and writs of habeas corpus. This Court affirmed petitioner Pierre's conviction and death sentence in *State v. Pierre*, Utah, 572 P.2d 1338 (1977), and those of petitioner Andrews in *State v. Andrews*, Utah, 574 P.2d 709 (1977). On consolidated petitions for rehearing, the opinion in *State v. Andrews & Pierre*, Utah, 576 P.2d 857 (1978), was issued, again affirming the convictions of both petitioners. On collateral review, this Court upheld both convictions once again in *Pierre v. Morris*, Utah, 607 P.2d 812 (1980), and *Andrews v. Morris*, Utah, 607 P.2d 816 (1980).

On this second round of petitions for collateral review, the issue is whether the *Wood* holding must be applied retroactively to petitioners' cases.

## I. THE WOOD STANDARD

In the penalty phase of the *Wood* trial, the trial judge found that the aggravating factors "preponderated" over the mitigating factors, and specifically indicated that he did *not* find that the former outweighed the latter beyond a reasonable doubt. He went on to indicate that, having found the aggravating factors to "preponderate," he believed that he was "required" by law to impose the death sentence. The issue squarely posed in *Wood*, therefore, was "whether a death sentence may be sustained when the mitigating factors are sufficiently strong when compared with the aggravating factors to create a substantial and reasonable doubt that the death penalty is appropriate." *Wood* at 78. We held that it could not. Our holding was based upon our interpretation of U.C.A., 1953, § 76–3–207, which directs the sentencing authority to consider in the presentence

hearing "the nature and circumstance of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty," including the aggravating factor(s) under § 76–5–202 already proved at the trial on guilt. We said in *Wood:*

> However, § 76–3–207 does not indicate what weight should be accorded individual aggravating and mitigating factors, or what standard should govern in reaching a decision based on a comparison of the totality of the aggravating factors and the totality of the mitigating factors. The statute does not even state that a comparison must be made. The sentencing authority is simply directed by § 76–3–207 to "consider the penalty." Obviously, however, it is implicit in the statutory scheme that a comparison of aggravating and mitigating factors must be made and a decision reached based on the result of the comparison.

*Id.* at 79.

In the absence of specific statutory standards to be used in the above-described comparison process, this Court in *Wood* undertook to interpret our death penalty statute in a manner consistent with "potential constitutional considerations and legislative intent." We said:

> Therefore, construing § 76–3–207, which deals with sentencing in capital cases, in light of the legislative purposes stated in § 76–1–104(3) and (4) and § 76–1–106, we conclude that the stated objectives cannot be *consistently achieved in a capital case* unless the decision to impose the death penalty is made on the basis of the reasonable doubt standard. To impose the death penalty, notwithstanding serious doubt as to its appropriateness, *would create in some cases—as in this case—*a substantial possibility of "arbitrary ... treatment" and permit "penalties which are [not] proportionate," a result that is forbidden by the Legislature and that would raise issues of a possible constitutional magnitude.

*Id.* at 83 (emphasis added) (footnote omitted). Our primary concern in *Wood*, therefore, was to provide a standard for the sentencing authority to guide it in its comparison of aggravating and mitigating factors, and to ensure that the death penalty would not be imposed where, as in *Wood*, that authority entertained substantial doubt about the appropriateness of its imposition. Our fundamental objective was to ensure the *consistent* application of the penalty, and to protect in the future against the circumstances which existed in *Wood*, namely, the imposition of a death penalty where there existed a reasonable doubt about the persuasive value of and weight to be given to the mitigating factors found by the trial court as opposed to the aggravating factors. We noted in *Wood* the express findings of the trial court as to mitigating and aggravating factors:

> The trial judge expressly found the following three mitigating circumstances: (1) the defendant had "absolutely no past criminal history or record;" (2) he was "somewhat of a sickened individual but not a depraved individual;" and (3) "at the time of the murder, his capacity to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease, intoxication or influence of drugs." As to the absence of prior criminal activity, the trial court stated "that is very mitigating." The single aggravating circumstance the trial judge found was the "ruthlessness and brutality of the murder,"[1] and he ruled that outweighed the mitigating factors.

*Id.* at 78 (footnote omitted). A further factor in our reversal of the death penalty in *Wood* was our holding that, "as to any class of capital murders under Utah law, 'ruthlessness and brutality,' as an aggravating factor, must be limited to those murders involving an aggravated battery or

torture." *Id.* at 86 (footnote omitted). Inasmuch as no aggravated battery or torture existed in *Wood*, and because the trial judge failed to specifically find or indicate his reliance on any other aggravating factor in the penalty phase, it was readily apparent in *Wood* that the mitigating factors should have prevented the imposition of the penalty and that there had to exist a reasonable doubt about its appropriateness on the facts of the case. Indeed, the trial judge candidly observed on the record that he did not "find that [the aggravating circumstances outweigh the mitigating circumstances] beyond a reasonable doubt, but [he found] that the aggravating preponderates." *Id.* at 78.

We emphasize for clarity that the *Wood* standard has to do with the degree of persuasion or certitude on the part of the sentencing authority about the decision to sentence to death. It does not affect or change standards relating to the burden of proof of facts borne by the prosecution at either the guilt or the penalty phase of the trial. The truth or accuracy of facts is not at issue in the comparison process which the *Wood* standard governs. Rather, the *Wood* standard affects the exercise of the sentencing authority's judgment about the suitable disposition of a defendant under the circumstances peculiar to him and his crime, after the facts establishing his guilt have been proved beyond a reasonable doubt.

> Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sentencing body, in making the judgment that aggravating factors "outweigh," or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty

---

1. The evidence in *Wood* showed that the defendant abruptly and without warning shot and instantly killed a man to whom he and his companion had given a ride and later took money and credit cards from the victim's body. Although the theft of the victim's property was an aggravating factor under our statute, the trial judge did not mention it at the time he described the facts upon which he was relying in the sentencing hearing.

is justified and appropriate after considering all the circumstances.

*Id.* at 83–84.

There is a significant difference, which has been largely ignored in the petitioners' briefs and arguments in this proceeding, between the process by which guilt is determined and the process by which a choice between life imprisonment and the death penalty is made. As the United States Supreme Court recently observed in *California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983):

> More to the point, however, is the fundamental difference between the nature of the guilt/innocence determination at issue in *Beck* [*Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)] and the nature of the life/death choice at the penalty phase.... In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.
>
> ....
>
> In short, the concern of *Beck* regarding the risk of an unwarranted conviction is simply not directly translatable to the deliberative process in which the capital jury engages in determining the appropriate penalty, where there is no single determinative issue apart from the general concern that the penalty be tailored to the individual defendant and the offense.

103 S.Ct. at 3456–57 (footnote omitted). Thus, much of the petitioners' argument relating to the importance of the "beyond a reasonable doubt" standard in the guilt determination process is simply irrelevant to considerations affecting sentencing.

## II. RULE 65B UTAH RULES OF CIVIL PROCEDURE

■ The State contends that petitioners may not raise their *Wood*-related claims in petitions for relief under Rule 65B(i), Utah R.Civ.P., because that rule is limited to claims of "substantial denial of ... rights under the Constitution of the United States or of the State of Utah, or both ...," and the *Wood* holding is grounded in statutory construction. This contention construes petitioners' claims too narrowly. It is true that petitioners argue that the *Wood* standard is constitutionally mandated,[2] but that is not the only basis they claim for relief under Rule 65B(i). They also argue that it would be a denial of due process and equal protection under the Utah and federal constitutions to fail to apply the *Wood* standard to their cases retroactively. Such claims qualify for review under Rule 65B(i), and we reject the State's position to the contrary.

---

**2.** In *Wood,* while we acknowledged the "potential constitutional dimension" of the standard of persuasion in the sentencing decision, we specifically limited the holding to the "preferred grounds of statutory construction." *Id.* at 82. We did not hold that a standard of certitude beyond a reasonable doubt in the sentencing decision is required by the Utah or the federal constitution. The United States Supreme Court has likewise never held that the U.S. Constitution requires such a standard; it has upheld as constitutional state statutes with varying standards. *See Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982); *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). More recently, in *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court reaffirmed its unwillingness to require any specific standard to guide the sentencing body as it weighs factors militating for or against the death penalty:

> As we have discussed, ... the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances ....

*Id.* 103 S.Ct. at 2750.

## III. WAIVER

■ Before we can proceed to treat petitioners' claims on the merits, we must also respond to the State's contention that petitioners waived the claims raised here by failing to raise them by objection in the penalty phase of the trial and by failing to seek review on direct appeal and in prior habeas corpus proceedings. Basically, the State argues that the retroactivity of the *Wood* ruling on the "degree of certainty" in sentencing cannot be raised by collateral attack because the point might have been, but was not raised on direct review. This argument is premised on well settled Utah law to the effect that:

> [A]llegations of error that could have been but were not raised on appeal from a criminal conviction cannot be raised by habeas corpus or postconviction review, except in unusual circumstances.

*Codianna v. Morris,* Utah, 660 P.2d 1101, 1104 (1983). *See also Chess v. Smith,* Utah, 617 P.2d 341 (1980); *Brown v. Turner,* 21 Utah 2d 96, 440 P.2d 968 (1968); *Bryant v. Turner,* 19 Utah 2d 284, 431 P.2d 121 (1967).

■ The petitioners assert that they raised the "burden of proof" argument on direct appeal and in their prior petitions for postconviction relief. A great deal of confusion on this question is generated by the indiscriminate use by petitioners' counsel of the term "burden of proof" to refer both to the proof of the existence or nonexistence of *facts,* and to the "level of persuasion" or "degree of certainty" in the sentencing decision which was addressed in *Wood.* We set forth in detail hereafter the history of petitioners' references to this issue. Neither petitioner submitted any proposed jury instructions at the penalty phase of his trial. Andrews did not object at all to the jury instructions given. Pierre objected to the jury instruction which read as follows:

> There is no fixed standard as to the degree of persuasion needed for a particular sentence, as the law leaves that consideration to the jury but the burden

of proof to satisfy the jury that a death sentence is appropriate is on the State. His objection, through counsel, stated:

> Mr. Athay: We except to instruction number four wherein it states there is no burden of proof necessary, no degree of burden of proof as to the penalty that should be imposed. I submit that there is a degree and that degree would, if not reasonable doubt, be at least clear and convincing evidence, and we would therefore . . . .

> The Court: I have researched this and have come to the conclusion, as with the judge, it is jury conscience.

In his Amended Brief on appeal (which was adopted by petitioner Andrews), Pierre included as his twelfth point the following: "The failure of the trial judge to apply the standard of proof beyond a reasonable doubt in the appellant's hearing on sentence violated the due process clause of the Utah and United States Constitutions." Under that point, however, the petitioner discussed the cases of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), in the context of the State's obligation to prove beyond a reasonable doubt "every *fact* necessary to constitute the crime charged," including the absence of an affirmative defense. The point of that discussion in the petitioners' brief on direct appeal was summed up in the following discussion:

> Under the Utah Law, the determination of whether the defendant will be punished by death or by life imprisonment depends upon whether the penalty of death is mitigated by any of the seven statutory enumerated circumstances which the judge or jury must consider in their decision [citation omitted]. The appellant contends that the prosecution has the burden to prove beyond a reasonable doubt the absence of any mitigating factor which the defendant raises in the sentencing proceedings. If this burden is not placed on the State than [sic] the consequence of death can be imposed if the trier of fact finds that the evidence of the aggravating circumstances pre-

ponderates over the evidence of the mitigating factors.

In the case before the Court, the trial judge instructed the jury during the penalty phase as follows: [Instruction on standard of persuasion and burden of proof omitted.] The trial court did not even instruct the jury that they must bring back the death sentence only upon a finding based upon the preponderance of the evidence.

The appellant submits that the trial judge's failure to apply the traditional reasonable doubt standard to the determination of whether or not the death penalty would be imposed violated the Due Process Clause of the Utah Constitution, Article I, Section 7.

It may be seen from the above language that petitioners, in their cases on direct appeal, confused the issue of the burden of proof of the existence of *facts* in aggravation or mitigation of their crime with the issue of the degree of certitude that the jury must reach about the imposition of the death penalty after consideration of mitigating and aggravating circumstances. The State's brief on appeal addressed only the first issue, apparently taking that to be the sole question raised by the appellants' briefs. The State's arguments were directed to the point that there is no burden on the State to disprove mitigating factors in the penalty phase of a capital case. No reply brief was filed by petitioners in clarification of the issues. In the opinion of this Court in *State v. Pierre*, it is clear that the Court interpreted the appellants' arguments as having to do *primarily* with the burden of proof respecting the existence of aggravating and mitigating *facts*.

Defendant contends that the failure of the District Court to apply the standard of proof beyond a reasonable doubt in the defendant's penalty phase violated the Due Process Clause of the Utah and United States Constitutions. *Specifically he contends that the State had the burden to prove beyond a reasonable doubt the absence of any mitigating factor which the defendant raises in this phase,* and he cites *Mullaney v. Wilbur,* as controlling.

*Pierre,* 572 P.2d at 1346 (footnote and citations omitted) (emphasis added). The Court went on to hold that *Mullaney* was not applicable to the penalty phase and that "neither *Gregg, Proffitt,* nor *Jurek* ... require[s] the state to prove absence of mitigating factors beyond a reasonable doubt." *Id.* at 1347. However, the opinion then recognized what it described as the "implicit" allegation by appellants that U.C.A., 1953, § 76–3–207(2) "does not establish a sufficiently high burden on the State in those instances where the penalty of death is imposed ... to pass constitutional muster, nor ... did the District Court's instruction require that sufficiently high burden." *Id.* Without any discussion of the "reasonable doubt" standard (indeed, as set forth above, appellants' briefs appeared to argue for a "clear and convincing" alternative), *State v. Pierre* held:

> [T]hat in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances.

*Id.* at 1347–48. Continuing, the Court compared Utah's statute to those of Florida, Georgia and Texas, and observed:

> In Utah, the burden being on the State to convince the jury that the death penalty is appropriate by proof of total aggravation outweighing total mitigation, though written findings are not required, the basic concern mentioned by Mr. Justice Stewart in *Gregg,* at 428 U.S. 189, 96 S.Ct. 2932, "to minimize the risk of wholly arbitrary and capricious action" is more fully satisfied with respect to a standard of proof, we submit, than those standards approved in *Gregg* and *Jurek;* and particularly when the standard of proof beyond a reasonable doubt obtains in the guilt phase in Utah to find the crime of murder of which aggravating circumstances are a part.

*Id.* at 1348.

From the foregoing review of the treatment accorded the standard of persuasion

by the parties and the Court in these petitioners' original appeals, we conclude that petitioners cannot be deemed to have failed to raise the "degree of certainty" issue. It was discussed by the petitioners in an imprecise and confused fashion and it certainly cannot be said to have been squarely posed as later occurred in *Wood*. This Court's opinion in *State v. Pierre* corresponded to the parties' formulation of the issues. The Court there determined that the jury instructions used in the trial satisfied the constitutional requirements set forth in the opinions of the United States Supreme Court. By articulating the requirement of total aggravation outweighing total mitigation without reference to a reasonable doubt standard, the Court rejected appellants' implicit argument, and ruled in favor of a preponderance standard.

Furthermore, the question of the retroactivity of the *Wood* ruling raised in these proceedings obviously could not have been argued by petitioners either on direct appeal or in their previous habeas corpus petitions because *Wood* had not yet been decided. Thus, we conclude that the doctrine of appellate waiver does not bar this action where petitioners raised the "degree of certainty" issue on direct appeal and where the decision whose retroactive application they seek had not been decided before their cases became final. We therefore address the merits of their claim that they are entitled to a retroactive application of the *Wood* standard and that such application requires the reversal of their sentences.

## IV. RETROACTIVITY

The question before us is whether the rule announced in *State v. Wood* must be applied retroactively to a case that was final before *Wood* was decided. This is a question of first impression in Utah. Because the issue of retroactivity of new rules of law, both those which are constitutionally based and those which are not, has been extensively developed by the United States Supreme Court, we will discuss in detail the status of the doctrine in the federal system. We note, however, that inasmuch as the *Wood* standard is grounded in construction of our state statute and not upon principles of federal (or state) constitutional law, we view the federal precedents as instructive but not binding except insofar as we explicitly incorporate them into our own law on retroactivity.

■ "[T]he federal constitution has no voice upon the subject" of retroactivity. *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932). Before the 1965 decision of *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the common law and the United States Supreme Court's decisions "recognized a general rule of retrospective effect for the constitutional decisions" of that Court subject to certain exceptions. *Robinson v. Neil*, 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973) (citing *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed.2d 178 (1886) and *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940)). The "Sunburst doctrine," from *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, left to the states the development of their own views on retroactivity where no question of impairment of federal rights is involved:

A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward.

*Sunburst*, 287 U.S. at 364, 53 S.Ct. at 148. In *Linkletter, supra*, the Court addressed the question whether the Fourth Amendment exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), should apply to convictions that had become final before *Mapp* was decided. *Linkletter* required the weighing of "the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U.S. at 629, 85 S.Ct. at 1737. The Court concluded that, under that test, the *Mapp* rule should not apply

to convictions which had become final before *Mapp* was decided.

In a later case, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the United States Supreme Court elaborated upon the standards which should govern the weighing process described in *Linkletter*. *Stovall* articulated three criteria to be used in determining the retroactivity or non-retroactivity of a new constitutional rule:

> (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Id.* at 297, 87 S.Ct. at 1970. The Court went on to conclude that "no distinction is justified between convictions now final ... and convictions at various stages of trial and direct review." *Id.* at 300, 87 S.Ct. at 1971.

The subsequent course of the retroactivity doctrine in federal case law has been tortuous.[3] In its most recent decision on the subject, *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the United States Supreme Court traced that history in considerable detail, summarizing as follows:

> Because the balance of the three *Stovall* factors inevitably has shifted from case to case, it is hardly surprising that, for some, "the subsequent course of *Linkletter* became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim." *Mackey v. United States*, 401 U.S. 667, 676 [91 S.Ct. 1160, 1171, 28 L.Ed.2d 404] (1971) (separate opinion of Harlan, J.). At one extreme, the Court has regularly given complete retroactive effect to new constitutional rules whose major purpose "is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials." *Williams v. United States*, 401 U.S. 646, 653 [91 S.Ct. 1148, 1152, 28 L.Ed.2d 388] (1971) (plurality opinion). *See also id.* at 653, n. 6 [91 S.Ct. at 1152, n. 6]; *Brown v. Louisiana*, 447 U.S. 323, 328–330 [100 S.Ct. 2214, 2219–20, 65 L.Ed.2d 159] (1980) (plurality opinion); *Hankerson v. North Carolina*, 432 U.S. 233, 243 [97 S.Ct. 2339, 2345, 53 L.Ed.2d 306] (1977); *Gosa v. Mayden*, 413 U.S. 665, 679 [93 S.Ct. 2926, 2935, 37 L.Ed.2d 873] (1973) (plurality opinion); *Ivan V. v. City of New York*, 407 U.S. 203, 205 [92 S.Ct. 1951, 1952, 32 L.Ed.2d 659] (1972).

> At the other extreme, the Court has applied some standards only to future cases, denying the benefit of the new rule even to the parties before the Court. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 490 [92 S.Ct. 2593, 2604, 35 L.Ed.2d 484] (1972) (establishing basic requirements applicable only to "future revocations of parole"). *Cf. Johnson v. New Jersey*, 384 U.S. [719], at 733 [86 S.Ct. 1772 at 1781, 16 L.Ed.2d 882], citing *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964), and *James v. United States*, 366 U.S. 213 [81 S.Ct. 1052, 6 L.Ed.2d 246] (1961). As an intermediate position, the Court has applied a change in the law to all future litigants, but retroactively only to the parties at bar. *See, e.g., Stovall v. Denno*, 388 U.S., at 301 [87 S.Ct. at 1972]; *DeStefano v. Woods*, 392 U.S. 631, 633 [88 S.Ct. 2093, 2095, 20 L.Ed.2d 1308] (1968); *Adams v. Illinois*, 405 U.S. 278, 284–285 [92 S.Ct. 916, 920, 31 L.Ed.2d 202] (1972) (plurality opinion); *Michigan v. Payne*, 412 U.S. 47 [93 S.Ct. 1966, 36 L.Ed.2d 736] (1973).

*Id.* 457 U.S. at 544–45, 102 S.Ct. at 2584–85. The majority opinion went on to describe a ... [c]onsistent stream of separate opinions since *Linkletter* ... [arguing] against selective awards of retroactivity.

---

3. *See generally* Beytagh, "Ten Years of Non-Retroactivity: A Critique and a Proposal," 61 Va.L.Rev. 1557 (1975); Orland and Stebing,

"Retroactivity in Review: The Federal and Washington Approaches," 16 Gonz.L.Rev. 855 (1981).

Those opinions uniformly have asserted that, at a minimum, all defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule [footnote omitted].

*Id.* at 545, 102 S.Ct. at 2585. The *United States v. Johnson* opinion ultimately adopted Justice Harlan's judgment in his dissent in *Desist v. United States*, 394 U.S. 244, 258, 89 S.Ct. 1030, 1038, 22 L.Ed.2d 248 (1969), that "[r]etroactivity must be rethought." *Johnson*, 457 U.S. at 548, 102 S.Ct. at 2586. The Court in *Johnson* determined that there were "three narrow categories of cases [in which] the answer to the retroactivity question has been effectively determined, not by application of the *Stovall* factors, but rather, through application of a threshold test":

First, when a decision of this Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way.

Conversely, where the Court has expressly declared a rule of criminal procedure to be "a clear break with the past," it almost invariably has gone on to find such a newly-minted principle nonretroactive. In this second type of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the "'new' constitutional interpretatio[n] ... so change[s] the law that prospectivity is arguably the proper course." Once the Court has found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the

new rule—have virtually compelled a finding of nonretroactivity.

Third, the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place .... In such cases, the Court has relied less on the technique of retroactive application than on the notion that the prior inconsistent judgments or sentences were void *ab initio*.

*Johnson*, 457 U.S. at 548–50, 102 S.Ct. at 2587–88 (footnotes and citations omitted). Determining that the case at hand fit into none of those three categories, the Court held that the new rule in question, announced in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (the Fourth Amendment prohibits warrantless and nonconsensual entries by police of suspect's home to make a routine felony arrest), should be applied retroactively to all cases still pending on direct appeal when *Payton* was decided.

To the extent necessary to decide today's case, we embrace Justice Harlan's views in *Desist* and *Mackey* [*Mackey v. United States*, 401 U.S. 667 [91 S.Ct. 1160, 28 L.Ed.2d 404] (1971) ]. We therefore hold that, subject to the exceptions stated below, a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.

By so holding, however, we leave undisturbed our precedents in other areas.[4] First, our decision today does not affect those cases that would be clearly controlled by our existing retroactivity precedents. Second, because respondent's case arises on direct review, we need not address the retroactive reach of our Fourth Amendment decisions to those cases that still may raise Fourth Amendment issues on collateral attack. Third, we express no view on the retroac-

**4.** Justice Brennan joined the majority opinion in *United States v. Johnson,* but did so "on [the] understanding that the decision leaves undisturbed our retroactivity precedents as applied to convictions final at the time of decision," *Johnson,* 457 U.S. at 563–64, 102 S.Ct. at 2594–95 (citing to *Stovall* ).

tive application of decisions construing any constitutional provision other than the Fourth Amendment. Finally, all questions of civil retroactivity continue to be governed by the standard enunciated in *Chevron Oil Co. v. Huson*, 404 U.S. [97], at 106–107 [92 S.Ct. 349, at 355, 30 L.Ed.2d 296]

*Johnson*, 457 U.S. at 562–63, 102 S.Ct. at 2594–95 (footnotes omitted).

■■■ The foregoing discussion of the retroactivity question illustrates that the doctrine has largely evolved in the context of constitutional rules in criminal cases. However, federal law appears to make no distinction between constitutional and non-constitutional rules in determining whether they should be applied retroactively. In *Halliday v. United States*, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969), a criminal defendant made a motion to set aside his conviction because the trial judge who accepted his guilty plea had failed to comply with Rule 11 of the Federal Rules of Criminal Procedure, which the Supreme Court had subsequently interpreted in *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). The Court set forth the three-pronged test used to decide the retroactivity of newly adopted constitutional rulings and said:

> In *McCarthy* we took care to note that our holding was based solely upon the application of Rule 11 and not upon constitutional grounds. Nevertheless, it is appropriate to analyze the question of that decision's retroactivity in terms of the same criteria we have employed to determine whether constitutionally grounded decisions that depart from precedent should be applied retroactively.

*Halliday*, 394 U.S. at 832, 89 S.Ct. at 1498–99. We agree with this assessment in the context of the present case. *Wood*, like *McCarthy*, was grounded in statutory interpretation, but we can see no reason to consider its retroactive application in light of factors different from those we would employ for a constitutional rule. Furthermore, we acknowledge the usefulness of

the federal precedents for the treatment of retroactivity questions in criminal cases, and we hereby explicitly adopt the following analytic standards for determining the retroactivity of new rules in criminal cases on collateral rather than direct review: 1) the purpose to be served by the new rule; 2) the extent of reliance on the old rule, and 3) the effect on the administration of justice of a retroactive application of the new rule. *Stovall v. Denno, supra; Linkletter v. Walker, supra; Tehan v. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

■■■ The primary purpose of the standard adopted in *Wood* was prophylactic, namely, to prevent the imposition of the death penalty when there exists reasonable doubt as to whether it should be imposed. *Wood*'s purpose was to ensure that Utah's statutory sentencing procedures would "only permit imposition of the death penalty on the basis of a high degree of confidence that that penalty is appropriate." *Wood*, 648 P.2d at 81. In construing our statute, we concluded that "the stated objectives cannot be *consistently* achieved in a capital case unless the decision to impose the death penalty is made on the basis of the reasonable doubt standard." *Id.* at 83 (emphasis added). As the United States Supreme Court observed in *Michigan v. Payne*, 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973),

> It is an inherent attribute of prophylactic constitutional rules, such as those established in [*Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966) ] and *Pearce [North Carolina v. Pearce*, 395 U.S. 711 [89 S.Ct. 2072, 23 L.Ed.2d 656] (1969), the decision whose retroactivity was under scrutiny in *Payne* ], that their retrospective application will occasion windfall benefits for some defendants who have suffered no constitutional deprivation. *Miranda*'s well-known warning requirements provided a protection "against the possibility of unreliable statements in *every* instance of in-custody interrogation," and

thereby covered many "situations in which the danger [was] not necessarily as great as when the accused is subjected to overt and obvious coercion." *Johnson v. New Jersey*, [384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966)], *supra*, at 730 [86 S.Ct. at 1779] (emphasis supplied). Thus, had *Miranda* been applied retroactively, it would have required the reversal of many convictions in which no serious constitutional violation had occurred. *Id.* at 731 [86 S.Ct. at 1779–80]. Likewise, the retroactive application of *Pearce* [establishing due process restrictions on the resentencing of defendants whose convictions had been reversed to avoid vindictiveness as a factor in a new sentence] would require the repudiation of many sentences rendered under circumstances in which there was no genuine possibility that vindictiveness played a role .... *Absent countervailing considerations rooted in the purposes underlying a new rule, this factor—that retroactive application of such broadly protective rules would occasion reversals in many instances in which no actual prejudice has been suffered—points toward a ruling of prospectivity.* *Id.* 412 U.S. at 53–54, 93 S.Ct. at 1969–70 (footnote omitted) (emphasis added).

*Michigan v. Payne* went on to note a further similarity between *Pearce* and *Miranda* that is equally applicable to *Wood:*

> While [*Miranda* and *Pearce*] created a protective umbrella serving to enhance a constitutional guarantee, neither conferred a constitutional right that had not existed prior to those decisions. The right against use of an involuntary confession long preceded *Miranda* just as the right to be free from fundamentally unfair sentencing considerations predated *Pearce*. Because these foundational rights remain available to defendants in pre-*Miranda* and *pre-Pearce* cases, a decision of non-retroactivity is less likely to result in the continued incarceration of those whose convictions or sentences rest on unconstitutional acts.

Of course, the question of the impact of particular decisions on the reliability and fairness of any aspect of a criminal proceeding is inherently a matter of balancing "probabilities." Yet in view of the fact that, if retroactive, *Pearce* would apply to innumerable cases in which no hint of vindictiveness appears, coupled with the consideration that due process claims may always be made in those prior cases in which some evidence of retaliatory motivation exists, we have little doubt that the "probabilities" in this case preponderate in favor of a ruling of nonretroactivity.

412 U.S. at 54–55, 93 S.Ct. at 1970 (footnotes and citations omitted). The rationale of *Michigan v. Payne* is particularly appropriate in the instant case. Petitioners' fundamental rights to fairness, consistency and due process in the sentencing process existed prior to *Wood*, and, as will be shown, constituted the primary substance of their direct appeals and habeas corpus petitions to this Court.

Petitioners rely heavily upon the analysis undertaken by the United States Supreme Court in cases involving constitutionally compelled rules which affect the accuracy of the determination of guilt or innocence. They cite *Ivan V. v. City of New York*, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972), where the beyond a reasonable doubt standard of proof from *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), was applied retroactively to a case on direct appeal. The Court in *Ivan V.* quoted the following language from *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971):

> Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so *raises serious questions about the accuracy of guilty verdicts in past trials*, the new rule has been given complete retroactive effect. Neither good faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to

require prospective application in these circumstances.

*Ivan V.,* 407 U.S. at 204, 92 S.Ct. at 1952 (quoting *Williams,* 401 U.S. at 653, 91 S.Ct. at 1152 (emphasis added)).

There exists, however, as we have already noted, a critical distinction between the reasonable doubt standard in guilt-innocence determinations and the degree of certitude standard in the penalty phase of a capital trial. The issue in petitioners' case was not whether the decision to impose the death penalty was *accurate,* but rather whether it was fairly made in the context of the circumstances of petitioners and their crimes. No measure of "accuracy" exists whereby that decision can be analyzed in the same way as the decision about whether a fact is true or false. "[S]entencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does." *California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 3456 n. 21, 77 L.Ed.2d 1171 (1983) (quoting *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 2756, 77 L.Ed.2d 235 (1983)), (Rehnquist, J., concurring in the judgment). The *Wood* standard was adopted by this Court because of the patent defects in the death penalty decision that had been made in that case and the need to prevent the recurrence of a similar problem. The purposes for its adoption therefore do not in and of themselves cast doubt on the fairness of decisions that were made, were reviewed by this Court, and became final well before *Wood* was decided.

The prophylactic purpose of the *Wood* standard, then, like the procedural rule at issue in *Michigan v. Payne, supra,* does not favor retroactivity. The remaining tests, having to do with reliance and the administration of justice, strongly militate in favor of non-retrospective application of *Wood* to petitioners' cases. However ambiguously it was raised by petitioners on direct appeal, the argument that a reasonable doubt instruction is required in the penalty phase was explicitly rejected in *State v. Pierre:*

> The substantial thrust of defendant's concern about standard of proof relates to his contention that the State must be required to prove beyond a reasonable doubt the absence of any mitigating factor which he raised in the penalty phase, and that matter has, of course, just been discussed.
>
> Implicit in that matter, however, is the allegation of error that the Utah Statute ... does not establish a sufficiently high burden on the State in those instances where the penalty of death is imposed, as in his case, to pass constitutional muster, nor, he contends, did the District Court's instruction require that sufficiently high burden. That instruction · stated that "... the burden of proof to satisfy the jury that a death sentence is appropriate is on the State."
>
> We hold that in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances. We believe the District Court's instruction thereon satisfied that requirement in this case.

*Pierre,* 572 P.2d at 1347–48 (emphasis in original).

Thus, when this Court in *Wood* amplified the standard regarding acceptable jury instructions by requiring the jury to be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that the penalty is appropriate, it implicitly rejected the *Pierre* holding and clearly changed the interpretation of our statute enunciated in *Pierre.* In all capital cases decided prior to the announcement of the *Wood* decision, an instruction consistent with the *Pierre* opinion has been proper.[5] Thus, the *Wood* rule falls within

---

**5.** The fact that a higher standard may have been in fact employed in some non-jury cases by

individual trial judges does not undermine the

the second category of retroactivity cases discussed in *United States v. Johnson, supra,* i.e., those in which a new rule of criminal procedure constitutes a "clear break with the past." As *Johnson* noted, the United States Supreme Court in such cases "almost invariably has gone on to find such a newly minted principle nonretroactive." *Johnson,* 457 U.S. at 549, 102 S.Ct. at 2587.

Furthermore, retroactive application of *Wood* to petitioners' sentences, which have been final for over six years, would not serve the administration of justice. We cannot fault in any particular the fairness of the process by which the penalty was imposed in this case. That process was examined in its entirety, with a comprehensive review of the trial record, by this Court on direct appeal and by the trial court and this Court on habeas corpus review. The result of that review is reflected in the following language from this Court's opinions in petitioners' prior appeals:

> [W]hen an appeal is taken [our statutes] provide for a comprehensive review of the entire case, including a review of a sentence of death to determine if that sentence resulted from prejudice or arbitrary action or was disproportionate to the penalty. Thus we believe that our review function "... substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury," [*Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976)] and "affords additional assurance that the concerns that prompted our decision in *Furman* [*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] are not present to any significant degree" in this case [*Gregg,* 428 U.S. at 207, 96 S.Ct. at 2941].

> . . . .

> [I]n our appellate review of this matter we conclude that the aggravating circumstances were overwhelmingly present against the defendant and the mitigating circumstances favoring him most mini-

point that the *Pierre* instruction was good law

mal—even from the point of view of inference.

*Pierre,* 572 P.2d at 1345-48 (citations and footnote omitted).

Because a comprehensive review of this case, being a capital one, is appropriate and necessary, we now address matters not specifically raised in defendant's brief, viz., ... whether the standard of proof applied by the District Court in the defendant's penalty phase violated due process .... [As to this matter], the reasons and conclusions stated in *Pierre, supra,* concerning them apply and control here.

As to the matter of alleged disproportionality between the capital offenses and the sentence of death imposed against the defendant, this Court recited in detail in *Pierre* the nature and circumstances of the three murders. We have briefly supplemented here these recitals by enumerating the particularized characteristics of the defendant and his involvement in these murders. And we conclude that so far as the verdict for death is concerned, the evidence discloses overwhelmingly that the jury could reasonably and unarbitrarily find as it did; and after our review of the matter, we hold that because of defendant's involvement in these murders and his background and characteristics, disproportionality between the crimes of murder and the death sentence does not exist.

*Andrews,* 574 P.2d at 710-711 (footnote omitted).

The record in this case reveals the evidence supporting the aggravating circumstances charged and discloses that the evidence in mitigation of the offense was virtually nonexistent.

*Andrews v. Morris,* 607 P.2d at 823 (footnote omitted).

In regard to the remaining contention that the death sentence can be mandatorily imposed, such is without merit under the facts of this case for Pierre did pursue his right to offer evidence of mitigat-

until *Wood.*

ing circumstances and argued the issue to the jury. As we noted in *Pierre*, the matters which he offered in mitigation were "most minimal—even from the point of view of inference."

. . . .

We reaffirm our holding in *Pierre* that the statutory system under which the sentence of death was imposed does not violate the Constitutions of Utah or of the United States and that all claimed errors are without merit. Following said statutory procedure, and given the especially heinous nature of the murders in this case, no rational judge or jury could have returned a verdict of other than guilty, *nor could they have determined other than that the aggravating circumstances thereof clearly outweighed those in mitigation.*

*Pierre v. Morris*, 607 P.2d at 815 (emphasis added).

The foregoing portions of this Court's opinions have been set forth at length because they conclusively demonstrate that the absence of a *Wood* instruction had virtually no prejudicial impact on petitioners' cases because of the comprehensive review afforded their sentences on appeal and collateral review. Thus, no purpose would be served by applying the *Wood* standard retroactively. If a reversal were required by virtue of that retroactive application, considerable violence would be done to the principles of finality and fairness in litigation. As the Florida Supreme Court commented (albeit on different analytical grounds) in *Witt v. State*, Fla., 387 So.2d 922 (1980), "[t]o allow ... that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." *Id.* at 929–30 (footnote omitted). Were such a result mandated by any fundamental unfairness or clear denial of due process in petitioners' death penalty proceedings, we would be required of course

to sacrifice the values of finality, but no such mandate exists in this instance.

In summary, we hold that the prophylactic purpose of the change in our procedural standard announced in *Wood* does not favor its retroactive application. Furthermore, the interests of finality as well as fairness would not be served by giving petitioners the benefit of a subsequent change in the law.

### V. HARMLESS ERROR

▮ Notwithstanding our holding that the *Wood* ruling should not be applied retroactively to cases which were final at the time *Wood* was decided, we note briefly that petitioners' sentences of death could be affirmed even if a retroactive *Wood* standard were applied. The language quoted at length above from this Court's prior opinions in petitioners' cases illustrates that the evidence at trial in fact met the *Wood* standard, and that the aggravating circumstances of petitioners' crimes so overwhelmingly outweighed the mitigating circumstances that "no rational judge or jury could ... have determined [otherwise]." This Court, upon its own independent, comprehensive review of the record was clearly convinced there was no basis for reasonable doubt as to the legality and appropriateness of the imposition of the death penalty in these cases.

Petitioners argue in effect that, constitutionally, there can be no such thing as "harmless error" in a capital case. That argument is conclusively rebutted by the opinions in two recent capital cases decided by the United States Supreme Court, *Zant v. Stephens*, —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida*, —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). In *Zant*, a Georgia jury, in imposing the death penalty, specified in writing its reliance on an aggravating circumstance which was subsequently held to be unconstitutionally vague by Georgia's Supreme Court. The United States Supreme Court said:

This case involves a statutory aggravating circumstance, invalidated by the

state Supreme Court on grounds of vagueness, whose terms plausibly described aspects of the defendant's background that were properly before the jury and whose accuracy was unchallenged. Hence the erroneous instruction does not implicate our repeated recognition that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."

*Zant*, 103 S.Ct. at 2748. Consequently, it held, "any possible impact cannot fairly be regarded as a constitutional defect in the sentencing process." The Court added:

> Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality. We accept that court's view that the subsequent invalidation of one of several statutory aggravating circumstances does not automatically require reversal of the death penalty, having been assured that a death sentence will be set aside if the invalidation of an aggravating circumstance makes the penalty arbitrary or capricious.

*Id.* 103 S.Ct. at 2749 (footnote omitted). As occurred in *Zant*, this Court in the *Pierre* and *Andrews* cases conducted a comprehensive appellate review and held that the death penalty was not imposed arbitrarily nor was it disproportionate. It also determined, by its own review, that no taint of unreliability infected the jury's consideration of the aggravating and mitigating factors in the case and its decision to impose the penalty.

*Barclay v. Florida* involved reliance by the sentencing judge in a capital case on an aggravating factor which was not specified in Florida's statute. In its opinion, the United States Supreme Court explicitly recognized the acceptability of the harmless error doctrine when properly applied in a capital case:

> These varied assertions seem to suggest that the Florida Supreme Court failed to

properly apply its own cases in upholding petitioner's death sentence. The obvious answer to this question ... is that mere errors of state law are not the concern of this Court, *Gryger v. Burke*, 334 U.S. 728, 731 [68 S.Ct. 1256, 1257, 92 L.Ed. 1683] (1948), unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.

> In any event, we do not accept Barclay's premise. Cases such as *Lewis* [*Lewis v. State*, Fla., 398 So.2d 432 (1981)], *Williams* [*Williams v. State*, Fla., 386 So.2d 538 (1980)], and *Dobbert* [*Dobbert v. State*, Fla., 375 So.2d 1069 (1979)] indicate that the Florida Supreme Court does not apply its harmless error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.

*Barclay*, 103 S.Ct. at 3428 (parallel citations omitted). The entire record of petitioners' original trial is before us in connection with these petitions. We are familiar with all of the facts concerning their crimes and all of the evidence submitted at their sentencing hearing.[6] We are able, on the basis of our examination of that evidence, to conclude with complete confidence that the use of the *Wood* standard in the penalty phase "could not possibly affect the balance." There can be no reasonable doubt that, in petitioners' circumstances, the totality of the aggravating factors outweighed the totality of the mitigating factors and the imposition of the penalty was appropriate.

## VI. IMPOSITION OF THE DEATH PENALTY AS ARBITRARY AND CAPRICIOUS

■ The petitioners allege that "the sentencing standard applied by this Court

6. *See* Appendix.

in *State v. Wood* has been applied by trial courts in several other cases, all involving white defendants, at the request of the prosecution and on advice of the Attorney General of Utah." They further allege: "of all defendants tried under this statute, only [petitioners] have had death sentences imposed and finally affirmed under a different sentencing standard from that required by *State v. Wood*." They imply that this circumstance is a result of racial discrimination, and that they have been sentenced to die because of their race and that of their victims. Although the facts they recite regarding the use of the *Pierre* standard and the *Wood* standard are substantiated by affidavits attached to their petition, they do not adduce nor even allude to the existence of any evidence that the treatment afforded them and other capital defendants was in any instance racially motivated. The State traces in its brief the origins of what eventually became the *Wood* standard in the concurring opinion of J. Stewart in *State v. Brown*, Utah, 607 P.2d 261 (1980). The State points out that prior to *Brown*, the *Pierre* standard was consistently used in capital prosecutions, *see, e.g., State v. Codianna*, Utah, 573 P.2d 343 (1977), but that, after *Brown*, a number of courts applied the "beyond a reasonable doubt" concept in the penalty phase of capital cases, as petitioners' affidavits show. J. Stewart's strong opinion in *Brown* provides a logical and non-racial explanation for this latter fact. Furthermore, the petitioners have failed to substantiate their argument with a showing that any particular defendant convicted of first degree murder under any standard should, under the facts and circumstances of his case, have received the death penalty but did not. We agree with the reasoning of the 5th Circuit Court of Appeals in *Spinkellink v. Wainwright*, 578 F.2d 582 (1978), when it said in response to a claim similar to that here:

> To allege discriminatory application of the death penalty, as meant in the context of this case, is to argue that defendants who have murdered whites have received the death penalty when other defendants who have murdered blacks, and who are equally or more deserving to die, have received life imprisonment. In order to ascertain through federal habeas corpus proceedings if the death penalty had been discriminatorily imposed upon a petitioner whose murder victim was white, a district court would have to compare the facts and circumstances of the petitioner's case with the facts and circumstances of all other Florida death penalty cases involving black victims in order to determine if the first degree murders in those cases were equally or more deserving to die. The petitioner thus requests the same type of case-by-case comparison by the federal judiciary that we have previously rejected in considering the petitioner's contention that Florida's death penalty is being imposed arbitrarily and capriciously. We need not repeat the myriad of difficult problems, legal and otherwise, generated by such federal court intrusion into the substantive decision making of the sentencing process which is reserved to the Florida state courts under Section 921.141. As we previously noted, this Court reads *Furman, Gregg, Proffitt, Jurek, Woodson*, and *Roberts* as holding that if a state follows a properly drawn statute in imposing the death penalty, then the arbitrariness and capriciousness—and therefore the racial discrimination—condemned in *Furman* have been conclusively removed. Florida has such a statute and it is being followed. The petitioner's contention under the Eighth and Fourteenth Amendments is therefore without merit.

*Id.* at 613–14 (footnotes omitted).

The court in *Spinkellink* went on to examine in detail the implications for a claim of racial discrimination of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and concluded:

Assuming for the sake of discussion that [the Florida statute] does have a racially disproportionate impact with respect to the race of first degree murder victims, *Washington v. Davis, supra,* and *Arlington Heights* mandate that petitioner's equal protection challenge must fail, because the discrimination is explainable on non-racial grounds.

*Spinkellink,* 578 F.2d at 615. We have already explicitly adopted the *Spinkellink* rationale in *Andrews v. Morris, supra,* and now hold that it continues to be applicable to petitioners' renewed claims of racial discrimination. As we said in *Pierre v. Morris, supra,* "the Utah statute is clearly constitutional 'on its face' and we determined in [*State v. Pierre*] that it was meticulously followed." 607 P.2d at 814. The petitions now before us contain nothing new regarding the issue of arbitrary imposition of the death penalty or of racial discrimination,[7] and we consequently hold that they may be disposed of as a matter of law,[8] as were the petitions in *Pierre v. Morris* and *Andrews v. Morris, supra,* without the necessity of an evidentiary hearing.

Having determined that due process and equal protection considerations do not require the retroactive application of our decision in *Wood* to petitioners' cases on collateral review, we deny their petitions for habeas corpus and post-conviction relief.

HALL, C.J., and OAKS and HOWE, JJ., concur.

STEWART, J., concurs in the result.

## APPENDIX

The evidence of aggravating and mitigating factors concerning petitioners and their crimes may be briefly summarized as follows:

The evidence at the guilt phase of petitioners' trial showed that on April 22, 1974, in the course of the robbery of a stereo equipment store, they held five people at gunpoint, all of whom were viciously tortured and seriously injured, one of whom was raped, and two of whom died as the result of their injuries. The victims were bound and imprisoned in the store's basement and were forced by both petitioners to drink a caustic chemical substance capable of causing their death. The State Medical Examiner testified that the substance would have caused the deaths of the murder victims but for the gunshot wounds they later sustained, and the death of the survivors but for the promptness of the medical attention given to them. Both petitioners covered the victims' mouths with tape after the administration of the caustic liquid. Petitioner Pierre shot one victim in the head in the presence of her son and later shot the son and the other three victims. Before shooting the 19-year-old woman, he raped her. Petitioner Andrews was present and either assisted or observed Pierre during all of the events described herein. He made no effort to halt the course of events. Pierre later attempted to strangle one of the surviving victims with an electrical cord and kicked a ball-point pen deep into his ear.

At the sentencing phase of the trial, the following evidence was admitted. A psychiatrist who had examined Pierre at the request of the defense testified that Pierre was able to distinguish both legally and morally between right and wrong and suffered from no mental defect or illness that would interfere with his ability to make decisions or to conform his actions to what he perceived to be right or wrong. The

---

**7.** We noted in *Andrews v. Morris* that Rule 65B(i), pursuant to which petitioners now seek relief, requires a plain and concise statement of the "factual data constituting each and every manner in which the complainant claims that any constitutional rights were violated." 607 P.2d at 821. Petitioners' complaints merely show by affidavit the use of particular sentencing instructions in particular cases. They provide no information regarding the facts and circumstances of those cases, nor do they demonstrate any improper or racially motivated action on the part of the sentencing body or the prosecutor.

**8.** *See also Codianna v. Morris,* Utah, 660 P.2d 1101 (1983).

doctor also stated that Pierre was of average intelligence. An Air Force personnel officer, called by the State, testified concerning Pierre's and Andrews' military records. Pierre's record revealed that he had wrongfully appropriated an automobile from another airman, had failed to report to duty on several occasions, had twice written checks with insufficient funds and was a "marginal performer" with limited potential as an airman. Petitioner Andrews' military record reflected a court-martial and time lost, a letter of reprimand for leaving the scene of an accident, another letter of reprimand for leaving his appointed place of duty, and a report that he had twice failed to go to his appointed place of duty. Petitioner Andrews was listed as a marginal performer and of limited potential as an airman. Andrews made no objection to this evidence, stipulated to its admissibility and admitted some of it for his own purposes.

Evidence of Andrews' prior conviction of auto theft was admitted without objection.

Pierre and Andrews then presented evidence of mitigating circumstances. A professor of criminology at the University of Utah stated that, in his opinion, the death penalty is not a deterrent. The former chaplain at the Utah State Prison gave a historical overview of capital punishment and stated that in his opinion biblical text did not support the imposition of capital punishment.

Pierre did not take the stand or present further evidence of mitigating circumstances in his case.

Andrews testified that: he was twenty years old; he was the youngest child in a family of five boys and one girl; he had never known his father, and his mother had been the sole support of the family; he had run away from home when he was ten years old; he was taken away from his parents and reared by an aunt and uncle until he was fifteen; he had received an eighth-grade education; he again ran away from home at age fifteen and burglarized a cafe; he was in a juvenile detention center for one year and four months; he then joined the Job Corps, where he received a general education diploma (equivalent to graduation from high school) and a welding certificate; he pled guilty to auto theft in San Antonio, Texas, and was placed on probation, and he then joined the Air Force.