STATE of Utah, Plaintiff and Appellee,

v.

William ANDREWS, Defendant
and Appellant.

William ANDREWS, Petitioner,

v.

Scott CARVER, Warden of the Utah
State Prison, Respondent.

Nos. 920308, 920309.

Supreme Court of Utah.

July 21, 1992.

Rehearing Denied July 29, 1992.

R. Paul Van Dam, Robert R. Wallace, Salt Lake City, for the State and Scott Carver.

Robert M. Anderson, Salt Lake City, Timothy K. Ford, Seattle, Wash., Gordon G. Greiner, Sandra Goldman, Donald A. Degnan, Denver, Colo., Julius Chambers, Steve Hawkins, New York City, for William Andrews.

## AMENDED OPINION

HALL, Chief Justice:

Defendant, under a sentence of death imposed by a jury in 1974, appeals the order of the district court which issued a new death warrant and set a new execution date of July 30, 1992.[1] The issue presented is whether the sentencing option of life without parole provided for in Utah Code Ann. § 76–3–207.5[2] has application in this instance.

On November 16, 1974, defendant was tried and convicted of three counts of criminal homicide, murder in the first degree, all capital offenses. On November 27, 1974, following the statutory sentencing hearing before a jury,[3] the sentence of death was imposed. That was and remains his sentence. The sentence has never been vacated or set aside, but has been stayed on numerous occasions to accommodate appeals lodged by defendant in both the state and federal systems over the past many years.

At the time of sentencing, Utah Code Ann. § 76–3–207(3) provided two sentencing alternatives. If the jury reported unanimous agreement to impose the sentence of death, the court was required to discharge the jury and to impose the sentence of death. If the jury was unable to reach a unanimous verdict imposing the sentence of death, the default sentence set by statute was life imprisonment, and the court was required to discharge the jury and to impose that sentence. Subsequently, effective April 27, 1992, the penalty provisions of Utah Code Ann. § 76–3–201, § 76–3–206, § 76–3–207, and § 77–27–9 were modified and a new section 76–3–207.5 was enacted.[4] This was done to accommodate a new sentencing alternative, that of life in prison without parole.

Defendant contends that the trial court "sentenced" him to death on June 2, 1992, when it issued the death warrant and that it erred in resentencing him without considering the option of life in prison without parole as provided for under the new statute. Resolution of this issue requires a determination of what constitutes a "sentencing" within the meaning of the statutory death sentencing scheme.

In capital cases, the statutorily required sentencing proceeding is conducted before a jury unless waived, in which event the hearing is before the court.[5] In substance and effect, the verdict of the jury is the sentence, which the court in turn is mandated to impose.[6]

When a judgment of death has been entered, a warrant signed by the judge is drawn and delivered to the sheriff of the county where the conviction is had, which in turn is delivered to the executive director of the Department of Corrections at the same time the defendant is delivered into custody. The warrant states the method and the date of execution, which may not be fewer than thirty days nor more

---

1. For the avowed purpose of insuring jurisdiction, defendant simultaneously filed a petition for a writ of habeas corpus, which we now dismiss.

2. Enacted in the 1992 general legislative session.

3. Pursuant to Utah Code Ann. § 76–3–207 (Supp.1974).

4. 1992 Utah Laws ch. 142, §§ 1–5.

5. Utah Code Ann. § 76–3–207(1).

6. Utah Code Ann. § 76–3–207(4).

than sixty days from the date of issuance of the warrant.[7]

■ The judgment of death may be stayed, as was done many times in this case, for purposes of processing appeals or other review.[8] Utah Code Ann. § 77–19–9 provides:

(1) *If* for any reason *a judgment of death has not been executed* and remains in force, the court where the conviction was had, on application of the prosecuting attorney, shall order the defendant to be brought before it. . . .

(2) When the defendant is brought before the court, it shall inquire into the facts and, *if no legal reason exists against the execution of judgment, the court shall make an order* requiring the executive director of the Department of Corrections or his designee *to ensure that the judgment is executed* on a specified day, not fewer than 30 nor more than 60 days thereafter, at an hour determined by the Department of Corrections.

(Emphasis added.)

It is thus to be seen that the proceedings before Judge Hyde in the district court on June 2, 1992, were not for the imposition of a new sentence. Rather, the proceedings were for the purpose of determining if any legal cause existed against execution of the judgment of death rendered following the imposition of sentence on November 27, 1974.

Utah Code Ann. § 76–3–207.5 is plain on its face and clearly provides:

(1) The sentencing option of life without parole provided in Sections 76–3–201 and 76–3–207 applies only to those capital offenses for which the offender is sentenced on or after April 27, 1992. The sentencing option of life without parole provided in Sections 76–3–201 and 76–3–207 has no effect on sentences imposed in capital cases prior to April 27, 1992.

Hence, Judge Hyde did not err in concluding that the new sentencing option has no retroactive application to defendant, whose date of sentence occurred on November 27, 1974.

Defendant advances three additional contentions, all of which we have duly considered and found to be without merit.

■ Following the proceedings before Judge Hyde, at the request of the court, counsel for the State assisted the clerk of the court in drafting an order directing execution of the judgment of death. However, a copy thereof was not provided to defense counsel. While it is true that the basic rules of practice require that a copy of such documents submitted to the court also be provided to opposing counsel,[9] in the absence of a showing of prejudice, the failure to do so did not constitute reversible error.

■ Defendant advances an accumulation-of-errors argument which he concedes has previously been addressed in prior appeals and petitions, most of which were rejected on procedural grounds.[10] An example of such is *Andrews v. Shulsen*,[11] wherein defendant appealed the denial of his petition for a writ of habeas corpus. Justice Howe, writing for the court, declined to reach the merits of the petition and concluded:

We have read the briefs filed by counsel for both parties and have heard extended oral argument from them. We conclude that "good cause" has not been shown by plaintiff as to why the claims he now makes were not raised on direct appeal or in prior postconviction proceedings. We are in accord with decisions of federal courts which hold that raising issues in a petition that were not but could have been raised in a previous petition, except where good cause is shown,

---

7. Utah Code Ann. § 77–19–6.

8. Utah Code Ann. § 77–19–8.

9. Utah R.Crim.P. 3(a); Utah R.Civ.P. 5(a).

10. Judge Hyde declined to address this issue as being beyond his jurisdiction in the proceeding before him, and indeed it was.

11. 773 P.2d 832 (Utah 1988).

constitutes an abuse of the writ and requires dismissal of the petition.[12]

A further example of dismissal and rejection of these same claims both on procedural grounds and on the merits is found in a subsequent habeas corpus petition filed in the federal system. *Andrews v. DeLand*[13] addressed five of the issues most often advanced by defendant as constituting accumulation of errors: (1) ineffectiveness of counsel; (2) failure to instruct the jury on the lesser included offense of second degree murder; (3) the jury's exposure to a note on a napkin depicting a hanging accompanied by the words "Hang the Niggers"; (4) use of a peremptory challenge to dismiss the only black juror impaneled; and (5) allegedly false testimony of the recidivism of convicted murderers. The issue of ineffectiveness of counsel was dismissed as an abuse of the writ; alternatively, the issue was found to be procedurally barred and, alternatively, *was found to be without merit.*[14] After a careful review of the record and discussion of the issue, the Tenth Circuit concluded that Andrews' counsel had *not* been ineffective at trial or on appeal. The second degree murder instruction issue was dismissed as an abuse of the writ.[15] The claims relating to the napkin incident were dismissed because it was brought in a successive petition.[16] The claims based upon the exclusion of the black juror were *rejected on their merits.*[17] Finally, the claims of allegedly false testimony during the penalty phase of the trial were dismissed as an abuse of the writ, and they were *also rejected on their merits.*[18]

Defendant's remaining contention is that execution after the lapse of nearly eighteen years·following conviction constitutes cruel and unusual punishment under both article I, section 9 of the Utah Constitution and the eighth amendment to the United States Constitution.

On the ground of waiver alone, this contention is without merit. It is only by virtue of the numerous appeals filed by defendant that so much time has elapsed.

In reaching the merits, we find the claim unpersuasive. As was observed in *State v. Bastian,*[19] the standard adopted earlier by this court for determining whether a penalty constitutes cruel and unusual punishment is "whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances."[20] The eighth amendment standard of proportionality does not differ in any material respect.[21]

In determining whether the sentence of death is disproportionate to the crime of which Andrews stands convicted, we view the evidence and all inferences which may reasonably be drawn therefrom just as we do in the review of any other question, " 'in a light most favorable to the verdict of the jury.' "[22] We recite the facts in light of that standard.[23] So viewing the facts, the punishment imposed upon Andrews is not cruel and unusual.

Andrews stands convicted of participating in a particularly brutal crime. The five victims of this crime were "tied up, made to lie on the floor, and forced to drink liquid

**12.** *Id.* at 833–34.

**13.** 943 F.2d 1162 (10th Cir.1991).

**14.** *Id.* at 1181–82, 1193–96.

**15.** *Id.* at 1180–81, 1183–84.

**16.** *Id.* at 1172–74.

**17.** *Id.* at 1176–80.

**18.** *Id.* at 1174–76.

**19.** 765 P.2d 902 (Utah 1988).

**20.** *Id.* at 904 (quoting *State v. Hanson,* 627 P.2d 53, 56 (Utah 1981)).

**21.** *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

**22.** *State v. Booker,* 709 P.2d 342, 345 (Utah 1985) (quoting *State v. Petree,* 659 P.2d 443, 444 (Utah 1983)); *accord State v. Udell,* 728 P.2d 131, 132 (Utah 1986); *State v. McCardell,* 652 P.2d 942, 945 (Utah 1982).

**23.** *State v. Verde,* 770 P.2d 116, 117 (Utah 1989); *accord State v. Warden,* 813 P.2d 1146, 1148 (Utah 1991).

Drano ... by [Selby] in company with Andrews, who aided [Selby] by pouring the caustic substance into a plastic cup for accomplishment of these violent acts. [Selby] and Andrews both had hand guns and [Selby] finally shot all five victims in the head with either a .25 caliber or [a] .38 handgun...." *State v. Pierre*, 572 P.2d 1338, 1343 (Utah 1977). All five victims were left for dead, but two miraculously survived.

Under the foregoing facts and circumstances, we think both state and federal standards as they bear upon cruel and unusual punishment are met. We have duly considered all of defendant's other arguments and find them to be without merit.

The judgment of the trial court is affirmed.

HOWE, Associate C.J., concurs.

STEWART, Justice (concurring):

I

I concur in the majority opinion. I write separately only because I think it important to respond to Justice Durham's criticism of the integrity of the judgment in this case. This case has generated much inflammatory criticism by the public at large, the press, and others, who have, almost without exception, no knowledge of the difficult legal issues that have had to be ironed out as a consequence of the case being the first to be tried under Utah's capital punishment statute. In dealing with the issues before the Court now, some eighteen years after the crime was committed, it is of the utmost importance that they be faced head-on, without making incorrect statements which can only exacerbate the passion and criticism that have surrounded this case from the beginning. Ordinarily, it would not be my practice to respond to Justice Durham's dissent. Nevertheless, while my own personal sympathies run in the same direction as hers, I think it necessary to respond to some of the assertions that she makes about the history of the case and the legitimacy of the proceedings which have led up to this last appeal.

Central to Justice Durham's criticism is her conclusion that:

The merging of Andrews' case with Selby's, in terms of theory, evidence, and strategy, continued uncorrected *and virtually unperceived* by the courts until Selby's death, when a clearer focus of the distinct circumstances affecting Andrews began to emerge. I am convinced that this court, during the direct appeals and the first two reviews on collateral attack, had a minimal basis for evaluating Andrews' claims independently from Selby's. Examination of our opinions reveals little or no close analysis of the facts related to Andrews' actions as distinguished from those of Selby.

Op. at 1036 (emphasis in original) (citations omitted). I submit that those conclusions are incorrect.

The Court's opinions on the direct appeals from Selby's (then known as Pierre) and Andrews' convictions were written by former Justice Frank Wilkins and were based on a review of the entire record, pursuant to our practice in death penalty cases to address manifest errors, even when they are not raised on appeal or presented at trial. From the beginning, attention has been paid to the factual differences between Selby's and Andrews' cases. *State v. Pierre*, 572 P.2d 1338 (Utah 1977), was a lengthy opinion that laid out the basic facts proved at trial against both defendants. In *Pierre*, Justice Wilkins summarized the evidence in the following fashion:

The evidence at the guilt or innocence stage of the trial (herein "guilt phase") established that the defendant, Andrews, and Roberts were airmen stationed at Hill Air Force Base, Utah. Stanley Walker, Michelle Ansley, Carol Naisbitt, Cortney Naisbitt (son of Carol Naisbitt), and Orren W. Walker, Jr. (father of Stanley Walker) were tied up, made to lie on the floor, and forced to drink liquid Drano on the evening of April 22, 1974, in the basement of the Hi–Fi Shop in Ogden, Utah, by the defendant in company with Andrews, who aided the defendant by pouring the caustic substance into a plastic cup for accomplishment of these

violent acts. The defendant [Selby] and Andrews both had hand guns and defendant finally shot all of the victims in the head with either a .25 caliber or .38 caliber handgun, which caused the deaths, within a brief period of time during that April evening, of Stanley Walker, Michelle Ansley (who had been raped by the defendant just before he shot her) and Carol Naisbitt.

572 P.2d at 1343.

In ruling that the trial court had not erred in refusing to sever Selby's and Andrews' trials, the Court in *Pierre* stated, "We find no merit to defendant's specific contention that he was denied a fair trial because Andrews and Roberts were attempting to bolster their own defenses by emphasizing certain portions of the eyewitness testimony of Orren Walker, who testified Andrews and Roberts were not present at the time defendant shot the victims as well as raped one of them." 572 P.2d at 1351. Thus, the Court was aware of the fact that Andrews was not present at the time of the shootings, and the opinion shows that the Court did not confuse or merge the separate factual bases for Andrews' and Selby's convictions.

In a separate opinion on the direct appeal of Andrews' conviction, *State v. Andrews*, 574 P.2d 709, 709 (Utah 1977), Justice Wilkins stated, "Facts, explanations, and other matters *supplemental* to those recounted in *Pierre* are stated in this opinion." (Emphasis in original.) He then summarized the additional facts relevant to Andrews' participation in the crime:

Evidence by witness Orren W. Walker, Jr., at the guilt phase revealed that defendant [Andrews] asked Pierre in the basement of the Hi–Fi Shop, after Pierre had discharged his handgun (not at that time shooting anyone), "What did you do that for, man"; that defendant was nervous and upset; that when Walker made no movement after being told by Pierre to administer the Drano to Michelle Ansley, Stanley Walker and Cortney Naisbitt, defendant said to Walker, "Man, there is a gun at your head"; that either before or after the administration of the Drano to the victims the defendant said: "I can't do it, I'm scared", though Walker stated he did not know to what this remark of defendant referred; and that Andrews, who left and returned to the basement on more than one occasion during the evening of April 22nd, was not observed firing any gun nor was he present when Michelle was raped and all the victims were shot.

Evidence at the penalty phase of the trial at which the defendant testified demonstrated that he was at the time of trial 20 years of age, was abandoned at birth by his father, left home when he was ten, committed a burglary at 15, went to the Job Corps thereafter, and committed auto theft while in the Job Corps (for which he was placed on probation). While in the United States Air Force, defendant failed to appear for a dental appointment, failed to report for duty, without authorization left a place of duty, and had a separation action from the Air Force commenced against him on the basis he was "minimal productive, and a limited potential airman", though this action was not completed due to his arrest in this case.

*Id.* at 709–10.

On direct appeal, Andrews' counsel raised those issues raised in Selby's appeal that attacked the constitutionality of the Utah death penalty statute. In addition, Andrews' appeal asserted that the trial court had erred in refusing to sequester the jury. After disposing of that contention, this Court undertook a "comprehensive review of the case," according to our general practice in capital cases. Among other points, the Court addressed whether the death penalty was "disproportionate and excessive in relation to the offenses for which he [Andrews] was convicted and his involvement therein." *Id.* at 710. The Court stated:

As to the matter of alleged disproportionality between the capital offenses and the sentence of death imposed against the defendant, this Court recited in detail in *Pierre* the nature and circumstances of the three murders. We have briefly supplemented here these recitals

by enumerating the particularized characteristics of the defendant and his involvement in these murders. And we conclude that so far as the verdict for death is concerned, the evidence discloses overwhelmingly that the jury could reasonably and unarbitrarily find as it did; and after our review of the matter, we hold that because of defendant's involvement in these murders and his background and characteristics, disproportionality between the crimes of murder and the death sentence does not exist. *Id.* at 710–11.

At the time these appeals were decided, I was not a member of this Court, but I was at the time of the first habeas review proceedings. There, I was concerned as to whether the evidence was sufficient to support a verdict of capital homicide against Andrews. Not having been here on direct appeal, I evaluated the evidence myself and wrote a concurring opinion addressing Andrews' contention that the death penalty was inappropriate because "it [had] never been alleged or proved that he personally took a life." *Andrews v. Morris*, 607 P.2d 816, 826 (Utah 1980) (Stewart, J., concurring). My opinion concluded:

> In the instant case, however, the trial judge instructed the jury with great care that the death penalty could be imposed only if the jury found that each defendant personally intended that one or more of the victims be killed. In my view the evidence in this case amply supports the implied jury finding that the appellant did in fact harbor such an intention.

Justice Durham's assertion that this Court has never focused on the facts as they pertain to Andrews is simply incorrect. She asserts:

> As an example of this obscured perspective, I cite to the fact summary appended to my own opinion in *Andrews v. Morris*, 677 P.2d 81, 98–99 (Utah 1983). In that summary, the court described the horrifying details of the crime, including the rape of a teenage girl and acts of vicious torture, and then said: "Petitioner Andrews was present and either assisted or observed Pierre [Selby] during *all* of the events described herein." *Id.* at 98 (emphasis added). There is now reason to believe that statement is inaccurate, and exaggerates the degree and nature of Andrews' complicity in the torture of the victims and the shootings themselves.

Op. at 1036–1037. While I agree that the statement in her prior opinion is incorrect, no consequence flowed from the misstatement. Her opinion dealt solely with the question of whether the standard of persuasion established in *State v. Wood*, 648 P.2d 71 (Utah 1981), governing the imposition of the death penalty, should have been held retroactive and applicable to Selby and Andrews. That was solely an issue of law; the facts of the case were irrelevant. Undoubtedly for that reason, the error was not picked up by other members of the Court. As shown above, however, where the facts were critical to the outcome of the determination, this Court has stated the facts accurately as to Andrews' participation and has assessed their significance apart from Selby's participation.

Justice Durham also contends that Andrews has never had an adjudication before this Court of his broad-based claim that he was denied effective assistance of counsel. While that is technically true, Justice Durham fails to note that the United States Court of Appeals for the Tenth Circuit in *Andrews v. DeLand*, 943 F.2d 1162 (10th Cir.1991), addressed on the merits the contention that Andrews was denied the effective assistance of counsel in the trial and direct appeal of his case. *Id.* at 1193–96. Although Justice Durham states that the court had declared those claims to be procedurally barred, in truth, the Tenth Circuit undertook a careful review of the record and concluded that the ineffective assistance claim was without merit. Furthermore, that issue has not been presented or argued on this appeal, contrary to Justice Durham's assumption.

## II

Although I see no legal reason why the judgment in this case can be set aside, I feel constrained to say that if I were a

member of the Board of Pardons, I would vote to commute the death sentence to a sentence of life imprisonment. William Andrews today is not the same person he was in 1974 when he fell in with Dale Selby. He was young then, having come from a terribly deprived childhood. Unlike any other person who has been sentenced to death in Utah, he did not himself kill. Because of his participation in the crime, the law holds him accountable, but he was not the driving force behind the homicides. His moral culpability was less than that of Selby, who now has paid the ultimate price for those crimes. In addition, the law has changed in a number of respects since Andrews was convicted. Not the least of those changes was our intervening decision in *State v. Wood*, 648 P.2d 71 (Utah 1981). Now even the statutory sentencing scheme has been modified.

I think that the purposes of the criminal law will not now be furthered by carrying out the sentence of death. A society that values life as this society does, ought not to feel compelled to push the legal process to its ultimate end. To do that in this case would, perhaps, fulfill the requirements of formal justice, but pure justice sometimes requires that formal justice be tempered with mercy and compassion. As a judge, I am constrained to apply the law; that I have sought to do. The law does not allow me to act solely on grounds of compassion. But I believe that this is a proper case for the application of compassion, one of the highest of human qualities.

ZIMMERMAN, Justice (concurring):

I concur in the majority's disposition of this matter. I write only to explain why the position I take today is consistent with my position in *Andrews v. Shulsen*, 773 P.2d 832 (Utah 1989). In *Shulsen*, I did not join the Chief Justice, Justice Howe, and Justice Stewart in finding a procedural

waiver of, *inter alia*, the claim of ineffective assistance of counsel as respects an entitlement to an instruction for a lesser included offense; however, I concurred in the denial of the writ. I was of the view that we should not find a procedural waiver of the claims asserted. *See, e.g., Fernandez v. Cook*, 783 P.2d 547, 550 (Utah 1989) (holding that defendant may raise ineffectiveness-of-counsel claim in a habeas proceeding despite failure to raise claim on direct appeal under unusual circumstances). But I was also of the view that if the merits of Andrews' claims were reached, either those claims of error would be found to be without merit or any technical error would have been found harmless. *Cf. Andrews v. DeLand*, 943 F.2d 1162, 1193–96 (10th Cir.1991) (rejecting Andrews' claims of ineffectiveness of counsel on their merits as an alternative ground for affirmance).

By joining the majority today, I do not suggest that Justice Durham's concerns are chimerical. But even where death is the penalty, perfection is not the standard by which we are to judge counsel, the jury, the trial judge, or the appellate proceedings. If it were, no sentence of death would ever be carried out. Whatever my views might be of the utility or morality of the death penalty, and however I might have voted as a juror in the present case, my duty as an appellate judge is to affirm the judgment below unless I am convinced that an error of prejudicial proportions has been committed. *See State v. Bishop*, 753 P.2d 439, 477 (Utah 1988); *State v. Tillman*, 750 P.2d 546, 561 (Utah 1987); *see also* Utah R.Evid. 103(d); Utah R.Crim.P. 19(c).

The proceedings in this case show that the justice system is not flawless, a judgment attested to by the division in almost every tribunal and panel that has reviewed the case.[1] Certainty about whether a par-

---

1. *See, e.g., Andrews v. Shulsen*, 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (Brennan and Marshall, JJ., dissenting from denial of petition for certiorari), *reh'g denied,* 485 U.S. 1015, 108 S.Ct. 1491, 99 L.Ed.2d 718 (1988); *Andrews v. De-Land*, 943 F.2d 1162, 1197 (10th Cir.1991) (McKay, J., dissenting in part); *Andrews v.*

*Barnes*, 779 P.2d 228, 229 (Utah 1989) (per curiam) (Durham and Zimmerman, JJ., dissenting); *Andrews v. Shulsen*, 773 P.2d 832, 834 (Utah 1989) (Durham, J., dissenting; Zimmerman, J., concurring in result (no opinion written)); *State v. Andrews,* 574 P.2d 709, 711 (Utah 1977) (Maughan, J., dissenting), *aff'd on reh'g,*

ticular judgment by court or counsel constituted error or whether a particular error was prejudicial is seldom possible. And I acknowledge that something approaching certainty is required when the judgment that an error did not occur or that an error did occur but was not prejudicial will result in a judicially-sanctioned killing. *See, e.g., Tillman*, 750 P.2d at 553 (noting the "well-established" proposition that, in capital cases, the contemporary objection rule does not apply). Yet having said all this, I remain convinced that none of the deficiencies in this case satisfy the legal standard for granting William Andrews relief from the judgment of guilt, or from the sentence of death. And, as Justice Stewart observes, we are empowered to look to no other standard.

DURHAM, Justice (dissenting):

## I. CUMULATIVE ERROR— INADEQUACY OF COUNSEL

I have become convinced that the State of Utah is prepared to execute a man who, because of ineffective legal representation, may not have had a fair opportunity to avoid the death penalty in the sentencing phase of his original trial. That it has taken so many years for this problem to confront this court is a function of historical context and failures in defendant's post-conviction review process, some of which may fairly be attributed to counsel and some to the courts, but none of which justifies this court's present refusal to review defendant's claims on the merits, or at the least to require that a trial court do so at an evidentiary hearing.[1]

In 1974, when defendant Andrews was convicted and sentenced to death, Utah's death penalty statute was newly enacted, in the wake of the United States Supreme Court's decision in *Furman v. Georgia*,

408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which had rendered Utah's former statute unconstitutional. Thus, Andrews' and his co-defendant Dale Selby's death sentences were the first under the new statute, and their direct appeal represented this court's first consideration of the death penalty after a dramatic shift in federal constitutional law. For nearly ten years after *Furman*, federal case law generated subtle, complex, and unpredictable development in capital punishment doctrine, and parallel treatment of the problems occurred in state law (both statutory and judicial). Andrews' case became enmeshed in the delays necessitated by the development of the law in this area to an unprecedented extent. It has become common in the media and public discussion to characterize this case as "typical" of confusion and delay in death penalty cases in Utah, because of the numerous petitions for collateral relief Andrews and his former co-defendant (who was executed in 1987) have filed in state and federal court, each of which has required time-consuming review. I would like to emphasize for the record that, because of its peculiar historical placement, and in part because of the omissions of Andrews' counsel, this case is not "typical" or in any way institutionally representative; it is unique. During its pendency, a number of other death penalty sentences, imposed at a time when death penalty law had become more settled and predictable, have been processed to finality in the state or federal systems, or both. *See State v. Bishop*, 753 P.2d 439 (Utah 1988) (affirming death sentence; Bishop subsequently executed); *State v. Norton*, 675 P.2d 577 (Utah 1984) (vacating death sentence); *Codianna v. Morris*, 660 P.2d 1101 (Utah 1983) (noting trial court's reduction of death sentence to life for three co-defendants); *State v. Wood*, 648 P.2d 71 (Utah 1981) (vacating death sentence); *State v. Brown*, 607 P.2d 261 (Utah 1980) (reducing

576 P.2d 857 (Utah 1978). In addition, one member of the three-person Board of Pardons dissented from the decision to deny Andrews clemency.

1. The majority of the court has refused to issue a stay of execution (currently scheduled for July 30, 1992). Therefore, the time available for preparation of the opinions herein has been severely limited. I think such haste in such matters is unseemly, and I hope it will not prove to have detracted too seriously from the quality of our analysis.

death sentence to life); *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (denying rehearing; Gilmore subsequently executed). Furthermore, finality in the companion case regarding Dale Selby was achieved five years ago. *See Pierre v. Shulsen,*[2] 802 F.2d 1282 (10th Cir.1986) (final affirmation of death sentence; Selby subsequently executed).

I make the foregoing observation in response to the State's forcefully made argument in this proceeding, which I fear may have unduly influenced the majority, that the need for finality in this case must override all other concerns. The tragic consequences of delay, especially for the survivors of this crime (including the families of the murdered victims) are matters of grave concern. But delay in the service of fundamental fairness in the imposition and execution of the death penalty is a cost imposed upon us all by our constitutional system. We are all diminished by this grim process. But we would be further diminished if we were to allow the State to put people to death without it. The State has urged this court to refuse review of Andrews' substantive claims because the integrity of the courts requires finality. We must not forget, however, that this same integrity also requires, perhaps more urgently, that no defendant be put to death when confidence in the fundamental fairness of the process by which he was sentenced to die has been undermined. "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.... Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

My confidence in the reliability and integrity of this death sentence has been seriously undermined by the following considerations:

1. Andrews' trial and initial appellate counsel was very recently out of law school and had no significant experience in felony defense and no experience at all in capital crimes. He appears to have relied very heavily on the experience and performance of counsel for co-defendant Dale Selby. The result at trial and on appeal was that Andrews' defense was "tied" to Selby's; Andrews' counsel mounted almost no separate defense. Andrews' proper defense, however, given his more limited participation in the homicides, should have been to distinguish his case as much as possible from Selby's, not to merge the two. Additionally, reliance on Selby's counsel created a significant conflict of interest, given that Andrews could have argued in mitigation that he had acted under the psychological control of Selby. Plainly, however, Selby's counsel would not have assisted Andrews in arguing that Selby was the significantly more evil perpetrator.

2. The merging of Andrews' case with Selby's, in terms of theory, evidence, and strategy, continued uncorrected *and virtually unperceived* by the courts until after Selby's death, when a clearer focus of the distinct circumstances affecting Andrews began to emerge. I am convinced that this court, during the direct appeals and the first two reviews on collateral attack, had a minimal basis for evaluating Andrews' claims independently from Selby's. *See Andrews v. Morris,* 677 P.2d 81 (Utah 1983); *Andrews v. Morris,* 607 P.2d 816 (Utah 1980); *State v. Andrews,* 576 P.2d 857 (Utah 1978); *State v. Andrews,* 574 P.2d 709 (Utah 1977). Examination of our opinions reveals little or no close analysis of the facts related to Andrews' actions as distinguished from those of Selby. In Andrews' direct appeal, for example, Andrews' counsel filed a seven-page brief containing no arguments about mitigation of Andrews' guilt. For the most part, Andrews' pleadings and briefs incorporated those of Selby, and scant attention was paid therein to the distinctions between

---

**2.** Selby "filed his federal habeas petition as 'Dale S. Pierre' [and] had been known throughout the state trial and state appeals as Mr. Pierre. Somewhere during the federal habeas proceed-ings, his attorney began referring to him as Mr. Selby." *Pierre v. Shulsen,* 802 F.2d 1282, 1282 n. 1 (10th Cir.1986). I refer to him throughout as Selby.

their specific actions during the course of the crime. This lack of specific and individualized focus on Andrews was, in my view, the result of the focus of the briefs [3] of the parties and a concentration on the part of the court on significant, abstract problems related to death penalty doctrine. As an example of this obscured perspective, I cite to the fact summary appended to my own opinion in *Andrews v. Morris*, 677 P.2d 81, 98–99 (Utah 1983). In that summary, the court described the horrifying details of the crime, including the rape of a teenaged girl and acts of vicious torture, and then said, "Petitioner Andrews was present and either assisted or observed Pierre [Selby] during *all* of the events described herein." *Id.* at 98 (emphasis added). There is now reason to believe that that statement is inaccurate and exaggerates the degree and nature of Andrews' complicity in the torture of the victims and the shootings themselves. Even based on a careful review of the record at trial, the statement is misleading: Andrews was present on the premises of the store when the rape, the shootings, and some of the torture took place. So, presumably, was the third codefendant Roberts, who helped transport stolen merchandise (and who was not convicted of homicide). Andrews was not, however, in the presence of Selby and the victims during the rape and shooting (and the strangling and assault of Orren Walker), nor did he "observe" these terrible acts. The failure of this court to note the significance of this factual distinction is symptomatic, in my view, of the degree to which counsel treated, and we viewed, Andrews and Selby as a unit at that stage of the proceedings.

A review of this court's analyses in the original Andrews and Selby appeals also reveals a conflation of the two defendants in areas in which the court should have viewed them separately. For example, the court addressed "whether the standard of proof applied by the District Court in the defendant's penalty phase violated due process." *State v. Andrews*, 574 P.2d 709, 710 (Utah 1977). A close reading of the *Andrews* and *Pierre* opinions in tandem reveals that the court gave Andrews' claim short shrift and unnecessarily merged the analysis of the two defendants into merely an analysis of Selby's claims and a dismissal of Andrews' claim based on that analysis. After raising the standard of proof regarding aggravating and mitigating factors in the *Andrews* opinion, the court simply states, "As to [this matter], the reasons and conclusions stated in *Pierre, supra,* concerning [it] apply and control here." *Id.* In the *Pierre* opinion, the court ruled against the burden-of-proof argument regarding aggravating and mitigating factors. It stated:

> We hold that in the *penalty* phase of capital offenses the burden of proof necessary for a verdict of death over life imprisonment is on the State and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances. We believe the District Court's instruction thereon satisfied that requirement in this case. And in our appellate review of this matter we conclude that the aggravating circumstances were overwhelmingly present against the defendant and the mitigating circumstances favoring him most minimal—even from the point of view of inference.

*State v. Pierre*, 572 P.2d 1338, 1347–48 (Utah 1977) (emphasis in original). The court made no separate mention or analysis of the aggravating and mitigating circumstances as they applied to Andrews. I can

---

3. The arguments in Andrews' brief on direct appeal rested almost entirely on those in Selby's brief. The only separate argument Andrews made was that the trial court's refusal to require jury sequestration was an abuse of discretion. *See* Brief of Appellant at 4, *State v. Andrews*, 574 P.2d 709 (Utah 1977) (No. 13902). Aside from a two-and-a-half-page discussion of that argument, Andrews relied on Selby's brief, thereby furthering the impression that the two defendants were a unit. The court observed in *State v. Pierre*, 572 P.2d 1338, 1351 (Utah 1977), "All parties cooperated fully in urging substantially the same objections and, for the most part, incorporating or joining in common motions, and points of error." All this contributed to the general sense, in the media and the public, among the lawyers, and most importantly, even in this court itself, that the two defendants acted as a unit.

only infer that, in the court's view, the aggravating and mitigating circumstances were identical for the two defendants, despite the fact that Andrews did not actually administer Drano, shoot, or rape any of the victims; Andrews was younger than Selby, had no violent history, and although the court apparently was unaware of this at the time, may have had significant mental deficiencies.

Furthermore, language in a concurring opinion suggests that its author may not have been entirely open to the defense's arguments on appeal:

> In addition to what is said about the charged errors, they impress me as no more than the usual and to be expected attempts to claim error on every possible pretext. I think it particularly applicable here to state that the declared policy of our law is that it should not be obstructed by unsubstantial technicalities....

*Pierre*, 572 P.2d at 1356 (Crockett, J., concurring). In that appeal, Andrews had raised claims regarding, among other things, the constitutionality of the recently enacted death penalty statute, prejudicial pretrial publicity, and the trial court's refusal to grant motions for separate trials and change of venue. Such arguments are hardly "pretext[s]" or "unsubstantial technicalities."

3. There were other significant and prejudicial consequences of the ineffectiveness of Andrews' counsel, a number of which were noted in the dissenting opinion of Judge McKay of the Tenth Circuit Court of Appeals in *Andrews v. DeLand*, 943 F.2d 1162 (10th Cir.1991). I quote the following from that opinion:

> (1) Counsel failed to interview [Andrews'] co-worker, a principal witness against his client, or to discover the inconsistent statement he had made when he was first contacted by the police.

> (2) Counsel failed to cross-examine the eyewitness using his testimony at a preliminary hearing to demonstrate the several significant ways in which his trial testimony magnified petitioner's apparent role in the crime.

> (3) Counsel did not prepare for the penalty phase by contacting witnesses to demonstrate the deprivations that Mr. Andrews suffered as a child. Nor did he request that his client undergo psychological examinations or investigate his client's background or schooling to discover that his client was a lifelong follower whose childhood IQ tests placed him in the range of mental retardation.[4]

> (4) On appeal, counsel filed a brief that totalled seven pages and contained a single and inaccurate citation of authority. The brief erroneously states that both petitioner and co-defendant [Selby] "were administering the caustic fluid." It fails to note that petitioner twice refused his co-defendant's orders, saying "I can't do it, I'm scared." It does not address petitioner's limited participation in the binding of the eyewitness or another victim nor address the taping of the victims' mouths.

> (5) Counsel joined in eight of the arguments presented by his co-defendant on appeal without even seeing the brief. Yet counsel inexplicably failed to join in the lesser included offense argument.

> (6) Counsel mentioned no mitigating evidence on appeal. Nor did he make argument to the disproportionate sentence.

*Id.* at 1198.

The claims raised before the Tenth Circuit in the foregoing case detailing the nature and extent of counsel's ineffectiveness have never, before the current petition, been brought to the attention of this court. The majority opinion in the Tenth

---

4. This factor is extremely significant in my view. One of the aggravating factors relied on by the State at Andrews' penalty hearing and by the courts that subsequently reviewed the sentence was Andrews' "marginal performance" in the military. If Andrews was suffering from a significant intellectual deficit at the age of nineteen because of his deprived background, his inability to perform adequately as an airman would more properly have been seen as a *mitigating* factor than an aggravating one. Counsel's failure to pursue this argument may (literally) have been fatal to Andrews' case, given the paucity of mitigating circumstances before the trial jury and the failure to argue mitigation on appeal.

Circuit case concludes that this court had declared those same claims to be procedurally barred in *Andrews v. Shulsen,* 773 P.2d 832, 833 (Utah 1988). *See Andrews v. DeLand,* 943 F.2d at 1188. That conclusion was incorrect. A close reading of our opinion shows that the issue raised in that petition for postconviction relief was the failure of the original trial court to give an instruction on a lesser included offense on behalf of Andrews; the ineffectiveness of trial counsel was raised *only* in the context of his failure to request the instruction at trial and to present arguments on that question on appeal. Thus, the Tenth Circuit majority was wrong in concluding that the full complement of ineffectiveness claims and arguments before it had ever been considered and rejected, even on grounds of procedural default, by this court.

I note that I dissented in 1988 from this court's denial of review of the claims that were raised in that petition, arguing that reliance on procedural default, given the complexities of the legal issues involved, raised the "terrible possibility that a defendant's life may be taken without fundamental fairness and due process." *Andrews v. Shulsen,* 773 P.2d at 834 (Durham, J., dissenting). Having been presented now for the first time with a fully developed argument on a spectrum of ineffectiveness claims, I am even more convinced that the majority errs in refusing to afford them either an evidentiary hearing or review on the existing record.

The State legitimately asks why it took so many years for the ineffectiveness issues to surface, and urges us to rely on procedural default to deny review. As I have indicated above, I believe the answer lies in the failure of defense counsel (including appellate counsel) and this court, prior to the death of Dale Selby, to focus adequately on the separate and distinct claims of William Andrews. It appears to me that that was done *for the first time* in 1990, in collateral proceedings in the federal district court. *Andrews v. Barnes,* 743 F.Supp. 1496 (D.Utah 1990). That failure is unfortunate and probably lamentable, but I do not believe that Andrews may

fairly be charged with its consequences when they include death. The bottom line is that Andrews has a strong factual claim that he did not have a fair opportunity to avoid the death penalty, and this court is refusing to review that claim on the merits. As I wrote in the opinion referred to earlier:

> There is no suggestion in this case of deliberate withholding of claims [regarding the lesser included offense instruction], and I view counsel's procedural default as excusable neglect under the circumstances. Indeed, in a death penalty case, I am inclined to think such neglect, to which the defendant himself cannot have contributed, *must* be excused.

*Andrews v. Shulsen,* 773 P.2d at 834 (Durham, J., dissenting).

As I indicated earlier, the majority of the court has refused to grant a stay of execution, and the record in this case has not been filed with us. I have therefore not undertaken in this opinion a full, independent analysis of Andrews' ineffectiveness claims. I am convinced, however, by Judge McKay's analysis, by my review of the briefs and opinions on file in this court for each of the proceedings before us, and by my recollection of the review of the record I undertook in preparation of the court's opinion in *Andrews v. Morris,* 677 P.2d 81 (Utah 1983), that those claims are meritorious. I would grant the petition, vacate defendant's death sentence, and remand for a resentencing proceeding.

## II. CONSTITUTIONAL IMPACT OF UTAH'S NEW SENTENCING STATUTE

I concede that by its terms, Utah's new capital sentencing statute does not apply to Andrews and was not intended to be applied to his case. For the legislature to have prohibited application of this change in the law to Andrews, however, results in a death penalty scheme that violates constitutional rights to fundamental fairness and humane treatment. Because of the paramount concern for fundamental fairness in

all capital sentencing proceedings, *see, e.g., Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), the death penalty imposed on Andrews in 1974 should not stand. The majority opinion entirely fails to address these constitutional problems, raised both in Andrews' brief and at oral argument.[5] The majority permits a miscarriage of justice in allowing the State to execute Andrews in 1992 based upon an eighteen-year-old justification that has now, because of a change in our law, disappeared.

In 1974, the prosecution argued to the sentencing jury that if it did not return a sentence of death, Andrews would be eligible for parole, that capital convicts paroled in Utah served an average of thirteen years in prison, that capital parolees often commit other homicides, and that the only way the jury could avoid this risk was to sentence Andrews to death. The State even introduced evidence of persons previously incarcerated for homicide who were paroled and who killed again. At the time, this evidence and attendant argument were at least factually accurate. Today they are not. Because Andrews continues to live and could now be sentenced to life without parole, it is fundamentally unfair to permit his execution to occur pursuant to the old law. If Andrews' jurors sentenced him to death in part or in whole because they were afraid to let him live in view of the risk of parole, the basis of their judgment has been rendered void by the recent change in Utah's law. Given the extent of the State's reliance on its "parole threat" arguments and my own assessment of its likely impact on jurors, I conclude that it almost certainly constituted a major factor in their deliberations.

The eighth amendment of the United States Constitution and article I, section 9 of the Utah Constitution prohibit the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; Utah Const. art.

I, § 9. It is cruel and unusual within the meaning of both provisions to execute a defendant who has spent eighteen years on death row because a jury was afraid he would be paroled after thirteen years when those fears have been rendered groundless by a change in the law regarding parole. Having just abandoned a major justification for Andrews' execution, on which it relied heavily at his trial, the State nonetheless seeks to send him to his death. Andrews undoubtedly perceives, as should this court, the irony and callousness inherent in this process. Having now made it explicitly possible for capital defendants to be sentenced to life without parole, the State cannot humanely execute a defendant who was in all likelihood condemned to die so he could never be paroled.

The Utah Constitution also prohibits treating criminal defendants and convicts with "unnecessary rigor." Utah Const. art. I, § 9. Although we have never explicitly articulated what constitutes unnecessary rigor, we have acknowledged that particular sentences themselves may violate this provision. *See State v. Russell*, 791 P.2d 188, 190–91 (Utah 1990). In Andrews' case, unnecessary rigor is manifest in two aspects of his current death sentence. It first exists in the legislature's refusal to extend the life without parole option to individuals who remain under a valid sentence of death entered prior to April 27, 1992. The choice to justify an execution on the basis that it is the only way to incapacitate a defendant—the "parole threat" argument—is an unnecessary legislative choice, as the recent legislative change confirms. Incapacitation (also known as specific deterrence) can be achieved through means less rigorous than death. Utah's death penalty statute prior to the recent changes violated the unnecessary rigor provision because it permitted the State to seek death sentences (as it did in this case) on the basis that death was the only way to inca-

---

5. The majority opinion does treat Andrews' eighth amendment claim that imprisonment on death row for eighteen years in itself constitutes cruel and unusual punishment. The constitutional issues I address here are entirely distinct. Furthermore, my cruel-and-unusual-punishment analysis herein pertains to the *process* by which the State imposes a penalty rather than to the proportionality of a given sentence, as is the focus of the majority's cruel-and-unusual-punishment analysis.

pacitate a defendant. Utah's new sentencing statute perpetuates this violation as to all individuals who remain under a sentence of death entered prior to April 27, 1992.

Second, apart from the foregoing argument that Utah's sentencing scheme is itself one of unnecessary rigor, unnecessary rigor also results from the majority's failure to require resentencing of Andrews in light of the constitutional problems the new statute creates. Despite the existence of the new sentencing options, the majority evidently concludes that it is constrained to permit Andrews' execution to go forward pursuant to the 1974 sentencing proceeding. But no such necessity exists. The new statute does not preclude Andrews, if his previous sentence is vacated, from receiving a new sentence under the life without parole option of the revised version of section 76–3–207. The fundamental unfairness of imposing an eighteen-year-old death sentence in the face of changed legal standards, and in the face of residual (and increasing) doubts about the adequacy of the proceedings to date, gives this court constitutional, not statutory, grounds for resentencing. Because the new statute by its own terms would then apply to Andrews, a major part of the justification for Andrews' death sentence—incapacitation—no longer would be part of the calculus his sentencer could consider. Because it is possible to resentence Andrews within the bounds of the new statute, this court treats Andrews with "unnecessary rigor" by refusing to do so and by permitting him to be executed on the basis of the 1974 hearing.

Accordingly, I conclude that Andrews' death sentence can no longer be legally or morally justified. The new statutory sentencing option does not apply to him. But having created an option of life without parole, the legislature has now made it obvious that a sentencing scheme that lacks a life-without-parole option as a means of achieving incapacitation (namely, the statute under which Andrews was sentenced) is unnecessarily rigorous. Furthermore, "cruelty" and "fairness" are constitutional principles, and their requirements cannot be "trumped" by rules of statutory construction. Capital punishment has enormous constitutional ramifications, implicating moral as well as legal principles, and the enactment of Utah's new sentencing statute has altered the constitutional balance. Because of the constitutional requirements that capital punishment be "consistent and principled [and] humane and sensible to the uniqueness of the individual," *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)—requirements that "give[ ] rise to a special 'need for reliability in the determination that death is *THE* appropriate punishment,'" *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S.Ct. 1981, 1985, 100 L.Ed.2d 575 (1988) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)) (emphasis added)—I am unable to sustain an unexecuted death sentence that current law renders unreliable.