**STATE of Utah, Plaintiff and Appellee,**

v.

**James Fred GORDON, Defendant and Appellant.**

No. 940558.

Supreme Court of Utah.

March 11, 1996.

Jan Graham, Atty. Gen. and Todd A. Utzinger, Asst. Atty. Gen., Salt Lake City, for plaintiff.

Kent E. Snider and Michael D. Bowhuis, Ogden, for defendant.

HOWE, Justice:

Defendant appeals from a conviction for possession of a controlled substance with intent to distribute, a second degree felony. Pursuant to rule 43 of the Utah Rules of Appellate Procedure, the court of appeals certified the case to this court.

## I. FACTS

On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly. *Cornia v. Wilcox,* 898 P.2d 1379, 1382 (Utah 1995); *State v. Dunn,* 850 P.2d 1201, 1205–06 (Utah 1993). On December 17, 1982, defendant James Fred Gordon was staying at the Brigham City apartment of his ex-wife, Ann Marie Frigon, as he occasionally did after their divorce six years earlier. That day, Frigon was "shocked" to learn that she was pregnant with Gordon's child. At about six or seven o'clock that evening, Gordon left the apartment, telling Frigon that he would be back in five minutes. Instead, he went to a bar and then to a friend's house, returning to the apartment about six o'clock the next morning. Frigon was angry with Gordon, especially after smelling his shirt, which "reeked of cologne," as she imagined that he had been with another woman. The two argued briefly before Gordon went to sleep.

A few hours later, Frigon found a plastic bag containing the drug lysergic acid diethylamide (LSD). She called the Brigham City Police Department and reported that Gordon was at her apartment and that he had some drugs. She met two officers outside her apartment and told them that there was LSD inside. Frigon explained that she knew it was LSD because Gordon had told her so and because she had seen him with LSD before. She stated that the LSD had fallen out of his coat pocket onto the floor and that she was afraid her young child might find and possibly eat it. Frigon gave the officers permission to enter her apartment to get the drugs.

Once inside the apartment, Frigon opened a closet and showed them the plastic bag protruding from a coat pocket. The bag contained a piece of graph paper with a unicorn design on it. Each square on the graph paper contained one dose or "hit" of LSD, and there were approximately sixty-five to seventy "hits" remaining on the paper.

The officers awoke Gordon and asked him to accompany them to the police station. He agreed and, while dressing, was advised of his *Miranda* rights. He asked the officers why they wanted to talk to him. They told him about the LSD in his coat pocket. Gor-

don responded, "Well, I know you've got me. What's the punishment for that?" One of the officers told Gordon he did not know what charges he would face. Gordon asked Frigon if she had told the police about the drugs. When she remained silent, he asked her why. She responded, "Well, because I wanted to protect my family."

At the police station, an officer read Gordon a written consent form explaining his *Miranda* rights which Gordon signed. Gordon admitted that the LSD was his. He explained that he had obtained it from someone in Salt Lake City, but he refused to identify the person. He said he did not intend to sell it.

An officer then called the county attorney to ask what charges should be filed. Due to the large number of doses of LSD, the county attorney told the officer to charge Gordon with possession with intent to distribute, a second degree felony. The officer told Gordon about the charges and possible penalties were he to be convicted. The officers then asked him if he would give them a written or taped statement. He refused and said he would no longer talk with them until he had spoken to an attorney.

## II. PROCEDURAL HISTORY

The procedural history of this case is rather complex, but it is relevant in analyzing the merits of Gordon's appeal. At Gordon's first appearance at the circuit court in Brigham City, Box Elder County, the judge found him to be indigent and appointed attorney Clinton S. Judkins to represent him. Unbeknownst to Gordon, at that time Judkins was a part-time prosecutor for the city of Tremonton, also located in Box Elder County. Following a jury trial on April 26, 1983, Gordon was convicted of the charged offense and later sentenced to a term of one to fifteen years in the Utah State Prison.

Judkins, on Gordon's behalf, filed a timely notice of appeal. Later, Judkins filed a motion for a new trial based on newly discover-

ed evidence, but the trial court denied the motion as untimely. In October 1983, the appeal was dismissed for failure to prosecute.

In July 1992, nearly nine years later, Gordon filed a motion in the trial court to be resentenced nunc pro tunc [1] because of his attorney's failure to prosecute his appeal. He contended that his constitutional right to an appeal was denied because Judkins had failed to pursue the appeal due to his conflict of interest as a city prosecutor. The court denied the motion as untimely and not supported "with sufficient affidavits or memoranda as required by law."

In January 1993, Gordon petitioned for a writ of postconviction relief. After an evidentiary hearing, the court denied the petition. In doing so, the court examined the retroactivity of *State v. Brown*, 853 P.2d 851, 857–59 (Utah 1992), in which we announced a prohibition against the appointment of attorneys with concurrent prosecutorial duties to represent indigent criminal defendants and a per se rule of reversal in such cases. The court concluded that *Brown* was not intended to be applied retroactively. Gordon appealed from that decision to this court.

Without conducting plenary review of Gordon's claims, we issued a September 24, 1993 order stating in its entirety:

Having decided that Gordon was denied his constitutional right to appeal, this court remands the case to the trial court for resentencing, so that Gordon may raise the issues here presented in a first appeal as of right. *State v. Hallett*, [856 P.2d 1060, 1062 n. 2 (Utah 1993)], noting proper resentencing procedure outlined in *State v. Johnson*, 635 P.2d 36, 38 (Utah 1981)[,] is under coram vobis through rule 65B(b), formerly rule 65B(i), of the Utah Rules of Civil Procedure.

The trial court is directed to have counsel on appeal appointed for defendant.

---

1. Nunc pro tunc "applie[s] to acts allowed to be done after the time when they should be done … with the same effect as if regularly done." *Black's Law Dictionary* 964 (5th ed. 1979); *see also State v. Johnson*, 635 P.2d 36, 38 n. 1 (Utah 1981) (*"Nunc pro tunc,* which means 'now for then,' is probably a misnomer for this circumstance, where the court is resentencing to give the judgment of conviction not retroactive but present effect—'then for now.' ").

On remand, the trial court resentenced Gordon nunc pro tunc to the same term as it had originally, one to fifteen years.

With new counsel, Gordon filed a motion for a new trial based upon (1) ineffective assistance of trial counsel because of his appointed defense counsel's concurrent position as a city prosecutor, and (2) newly discovered evidence in the form of a new witness, Danny Burke, one of Gordon's fellow inmates, who allegedly stated in 1983 that he was the owner of the drugs, that he had left them at Frigon's apartment, and that Gordon had no knowledge of the drugs for which he was charged.[2] After a hearing, the trial court denied the motion on the grounds that the case was remanded for the sole purpose of resentencing Gordon and that consideration of the motion was beyond the authority granted to the court. Furthermore, the court denied the motion on the merits, holding that (1) the prohibition against city attorneys representing criminal defendants was not retroactive, and (2) Gordon's "proffered affidavit of Danny Burke (a fellow inmate) appears to be of dubious value."

Gordon appealed to the court of appeals from his 1983 conviction and resentencing and from the denial of his motion for a new trial. Pursuant to rule 43 of the Utah Rules of Appellate Procedure, the court of appeals certified the case to this court to resolve the issue of whether the prohibition in *Brown* should be applied retroactively.

### III. ANALYSIS

#### A. Retroactivity of State v. Brown

In *Brown*, the defendant was represented by appointed counsel who was also a part-time city prosecutor. *Brown*, 853 P.2d at 856. He was convicted of second degree murder and aggravated assault. *Id.* at 852. On appeal, he contended that he was denied due process and the effective assistance of counsel when the court appointed a city prosecutor as his trial counsel. We agreed and reversed, holding:

Although we do not decide whether it is *constitutionally* impermissible to appoint a city attorney with prosecutorial responsi-

bilities to represent an indigent defendant, we conclude that vital interests of the criminal justice system are jeopardized when [it occurs]. Consequently, we hold that as a matter of public policy and pursuant to our inherent supervisory power over the courts, as well as our express power to govern the practice of law, counsel with concurrent prosecutorial obligations may not be appointed to defend indigent persons. . . .

. . . .

. . . [W]e announce a per se rule of reversal wherever such dual representation is undertaken so as to prevent its recurrence.

*Id.* at 856–57, 859 (emphasis in original).

■ Initially Gordon contends that by ordering his resentencing, this court "explicitly recognized that the prohibition against a part-time city prosecutor serving as an appointed defense attorney is applicable to Defendant's case." Gordon reads far too much into our order, which merely stated, "Having decided that Gordon was denied his constitutional right to appeal, this court remands the case to the trial court for resentencing, so that Gordon may raise the issues here presented in a first appeal as of right." The order clearly did not address the merits of Gordon's conflict-of-interest argument. It did not mention *Brown* or discuss its retroactivity. Rather, it merely required Gordon to be resentenced so that he could raise the argument on appeal.

■ Next, Gordon asserts that our decision in *Brown* entitles him to a new trial. *Brown* was expressly decided as a matter of public policy under our inherent supervisory power over the courts and our power to govern the practice of law, which powers are well settled. *Brown*, 853 P.2d at 857; *see State v. Carter*, 888 P.2d 629, 650 n. 32 (Utah) (and cases cited therein), *cert. denied*, —— U.S. ——, 116 S.Ct. 163, 133 L.Ed.2d 105 (1995). When we base a decision upon our supervisory power over lower courts, it is a clear indication that the decision will apply only to future cases. *State v.*

---

**2.** No affidavit of Mr. Burke was attached to the motion, and there is no copy of it in the record.

*Menzies,* 889 P.2d 393, 407 n. 7 (Utah 1994) ("[T]he invocation of our supervisory powers ... demonstrates a commitment on the part of this court to *prospectively* prohibit the use of the offending language [in the jury instruction at issue]." (emphasis added)), *cert. denied,* —— U.S. ——, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).

■ Furthermore, our decision in *Brown* announced for the first time that counsel with concurrent prosecutorial duties could not represent indigent defendants, a clear change from past procedures. We have previously held that when a new rule governing criminal procedure constitutes a clear break with the past, it is not generally applied retroactively. *State v. Hoff,* 814 P.2d 1119, 1123 (Utah 1991) (declining to retroactively apply strict compliance of rule in taking of guilty pleas); *Andrews v. Morris,* 677 P.2d 81, 95 (Utah 1983) (declining to retroactively apply reasonable doubt standard of proof in sentencing defendant convicted of capital offense); *see also State v. Long,* 721 P.2d 483, 492 (Utah 1986) ("from this date forward," defendants are entitled to cautionary instruction regarding eyewitness testimony when that testimony is a central issue).

In *Brown,* we expressly declined to decide whether the appointment of attorneys with concurrent prosecutorial duties was constitutionally impermissible. *Brown,* 853 P.2d at 856. However, even where we have adopted a new rule that is of a constitutional dimension, we have been reluctant to give it retroactive effect. *See, e.g., Neel v. Holden,* 886 P.2d 1097, 1103–05 (Utah 1994) (due process affords inmates disclosure of contents of their files, including psychological reports, prior to parole hearing; decision to apply prospectively only); *Labrum v. Utah State Bd. of Pardons,* 870 P.2d 902, 913–14 (Utah 1993); *Andrews,* 677 P.2d at 88.

Other reasons favor only prospective application of *Brown.* The primary purpose of the prohibition in *Brown* was clearly prophylactic, that is, to forbid "such dual representation ... *so as to prevent its recurrence.*" 853 P.2d at 859 (emphasis added). Applying *Brown* retroactively would unjustly benefit many defendants who received competent, effective assistance of counsel, despite their counsel's concurrent prosecutorial duties. Finally, the goal of maintaining the efficient administration of justice also strongly favors the prospective application of *Brown. See Labrum,* 870 P.2d at 912; *Andrews,* 677 P.2d at 91 (both examining these factors on collateral review in deciding against retroactivity).

Having concluded that the prohibition in *Brown* should be applied only prospectively, we must determine whether on this direct appeal, Gordon is nevertheless entitled to benefit from its holding. In *Menzies,* one year after the defendant was convicted, we disapproved of a "reasonable doubt" jury instruction in another case. 889 P.2d at 407 n. 7. On appeal, Menzies argued that he was entitled to benefit from the new case. We concluded that our invocation of supervisory powers "is a clear indication that we would strike down only *future* verdicts based on the offending [jury instruction]." *Id.* (emphasis in original). Thus, under *Menzies,* when under our supervisory powers we articulate a new cautionary policy, the defendants on appeal will not benefit from the new policy. Similarly, in *Hoff* we held that the defendant on appeal did not benefit from *State v. Gibbons,* 740 P.2d 1309, 1312 (Utah 1987), which mandated strict compliance with the rule governing the taking of guilty pleas. 814 P.2d at 1122. We concluded that *Gibbons* applied only to guilty pleas taken after its issuance. *Id.* at 1124. Likewise, we consistently limited the benefit of the cautionary instruction on eyewitness identifications that we mandated in *State v. Long,* 721 P.2d 483, 492 (Utah 1986), to cases tried after its date of issuance. *See State v. Griffiths,* 752 P.2d 879, 881 n. 3 (Utah 1988); *State v. Branch,* 743 P.2d 1187, 1190 (Utah 1987), *cert. denied,* 485 U.S. 1036, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988); *State v. Suniville,* 741 P.2d 961, 965 (Utah 1987); *State v. Jonas,* 725 P.2d 1378, 1380 (Utah 1986). We did so because we decided *Long* under our supervisory powers, despite our concern that a conviction without such an instruction "could well deny the defendant due process of law under article I, section 7 of the Utah Constitution." *Long,* 721 P.2d at 492.

■ We note that in two cases involving constitutional issues, we applied prior hold-

ings to claims pending in the district court *and to those on appeal.* *See State v. Taysom,* 886 P.2d 513, 513 n. 3 (Utah 1994) (addressing authority of court commissioners); *Labrum v. Utah State Bd. of Pardons,* 870 P.2d 902, 913–14 (holding that inmates have due process right to review information considered by parole board). However, these cases do not apply here. In *Brown,* we merely articulated a new cautionary policy under our supervisory powers. We conclude that Gordon does not benefit from the prohibition in *Brown* since his 1983 trial occurred well before we issued *Brown* in 1992.

Justice Stewart's dissent, joined by Justice Durham, states that *Brown* "implicated a defendant's Sixth Amendment right to counsel" and that "the issues underlying *Brown* are of a constitutional nature." Yet the *Brown* opinion, authored just three years ago by Justice Durham and joined by Justice Stewart (writing a concurring opinion on another issue), examined the conflict of interest question at length and concluded:

> [W]e do not decide whether it is *constitutionally* impermissible to appoint a city attorney with prosecutorial responsibilities to represent an indigent defendant.... [W]e hold that as a matter of public policy and pursuant to our inherent supervisory power over the courts, as well as our express power to govern the practice of law, counsel with concurrent prosecutorial obligations may not be appointed to defend indigent persons....

*Brown,* 853 P.2d at 856–57 (emphasis in original). The dissent would now apparently reverse Gordon's 1983 conviction because of his *constitutional* right to have trial counsel who did not have concurrent prosecutorial duties, even absent a showing of prejudice. We had the clear opportunity to enunciate such a holding in *Brown* but expressly refused to do so. We should not do so now.

The dissent relies upon cases in which the conflict of interest arose out of joint representation of multiple defendants, where, for example, one codefendant elected to plead guilty and testify against the other. *See State v. Smith,* 621 P.2d 697, 699 (Utah 1980). This represents a direct conflict of interest. However, the conflict of interest

faced by an appointed defense counsel who also has concurrent prosecutorial duties in another jurisdiction is much more remote. Here, where Gordon was convicted in a trial conducted before we issued *Brown,* we should require Gordon to show ineffective assistance of his defense counsel.

### B. Ineffective Assistance of Counsel

■ Although Gordon is not entitled to a per se reversal because of his trial counsel's concurrent prosecutorial duties, he is free to contend, and does contend, that he was denied due process of law and the effective assistance of counsel as a result of his counsel's representation. To demonstrate that his defense counsel's assistance was so inadequate as to constitute lack of counsel under the Sixth Amendment, Gordon must show that (1) his counsel's performance fell below an objective standard of reasonable professional judgment, and (2) he was prejudiced by the deficient performance. *State v. Lopez,* 886 P.2d 1105, 1113–14 (Utah 1994) (citing *Strickland v. Washington,* 466 U.S. 668, 690–94, 104 S.Ct. 2052, 2066–68, 80 L.Ed.2d 674 (1984)). These factors are not applied as a mechanical test but are meant to help us answer the ultimate question of whether the "defendant receive[d] a fair trial." *State v. Frame,* 723 P.2d 401, 405 (Utah 1986).

Gordon contends that his trial counsel failed to adequately investigate the possibility that the LSD underlying his conviction belonged to another person. At the trial, Frigon asserted that a "Mexican" woman named "Cathy" from West Valley City and three other people whom she had never met came to her apartment at approximately one o'clock the morning Gordon was arrested. Cathy allegedly described some LSD that featured a unicorn design like that on the LSD stamps police recovered from Gordon's coat pocket. The visitors stayed an hour to an hour and a half. According to Frigon, when she found the bag containing the LSD later that morning, she assumed Cathy had mistakenly left it. Frigon testified that because she was angry with Gordon, she put the LSD in his coat pocket and called the police to have him arrested. Just after Gordon was arrested, Cathy allegedly came back

to the apartment to reclaim the drugs. It was not until two days later that Frigon told the police about Cathy. Gordon asserts that his trial counsel failed to investigate whether the LSD belonged to Cathy and the other visitors.

We have held that "a decision not to investigate cannot be considered a tactical decision. It is only after an adequate inquiry has been made that counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons." *State v. Templin*, 805 P.2d 182, 188 (Utah 1990). In *Templin*, we held that the defendant, convicted of rape, was denied the effective assistance of counsel because his counsel did not contact several potential witnesses named by the defendant. *Id.* at 187–88. We reversed his conviction after concluding that the witnesses could have bolstered the defendant's assertion that the victim was a willing partner in the sexual activity, the only issue in contention at trial. *Id.* at 188–89.

■ This case is easily distinguishable from *Templin* because Frigon was unable to identify the persons who were allegedly in her apartment the morning of Gordon's arrest. She testified that she did not know Cathy's last name or the names of the other persons. Gordon's trial counsel cannot be faulted for failing to contact these unidentified witnesses.

■ Approximately two months after his trial, Gordon filed a motion for a new trial in which he submitted the affidavit of a fellow inmate at the Utah State Prison named Danny Burke. Burke asserted therein that he had been at Frigon's Brigham City apartment at approximately eleven o'clock the night before Gordon was arrested. He left when Gordon did not return as Frigon expected. According to Burke, it was not until he had returned to Salt Lake City that he realized he had left his bag of LSD at Frigon's apartment. Gordon admitted in his 1994 motion for a new trial that Burke's testimony "was unavailable at the time of Defendant's trial." That being the case, Gordon's trial counsel again cannot be faulted for failing to contact this witness to testify at trial.

Gordon has failed to demonstrate that his counsel's performance fell below an objective standard of reasonable professional judgment. Therefore, we do not reach the second prong of the *Strickland* test, whether Gordon was prejudiced by his counsel's performance.

### C. Motion for a New Trial

Following this court's September 24, 1993 order remanding for resentencing, Gordon filed a motion for a new trial based upon (1) ineffective assistance of trial counsel because of his appointed defense counsel's concurrent position as a city prosecutor, and (2) newly discovered evidence, i.e., the testimony of Danny Burke. After a hearing, the trial court denied the motion on the grounds that the case was remanded for the sole purpose of resentencing Gordon and that consideration of the motion was beyond the authority granted to the court. Alternatively, the court also denied the motion on the merits.

■ Gordon contends that the postconviction motion was properly before the trial court. We disagree. The order expressly "remand[ed] the case to the trial court for resentencing, so that Gordon may raise the issues here presented in a first appeal as of right." The only effect of the order was to provide Gordon with another opportunity to pursue the direct appeal that he was previously denied. In other words, Gordon's resentencing merely returned him to the position he was in before his appeal was dismissed. It did not allow him another opportunity to present postconviction motions.

In *Hallett*, cited in our order remanding for resentencing, the trial court on postconviction review determined that the defendant had been denied his right to appeal. *Hallett*, 856 P.2d at 1061. Rather than merely resentencing him so that he could pursue an appeal, the trial court proceeded to consider the merits of the other claims raised in the defendant's habeas proceeding. *Id.* at 1062. We held that the trial court erred in doing so because its action was contrary to the well-established principle that postconviction proceedings are not meant to be substitutes for direct appellate review and because it gave

the defendant an adjudication on the merits to which he was not entitled. *Id.* We held:

> Once a trial court on habeas review determines that a defendant has been denied the constitutional right to appeal, a direct appeal should be provided immediately, *without adjudication of any other claims,* such as ineffective assistance of counsel.

*Id.* (emphasis added). Although in this case it was an *appellate* court on habeas review which determined that Gordon had been denied his right to appeal, our holding in *Hallett* applies here. The trial court correctly determined that it was inappropriate to adjudicate Gordon's claims of ineffective assistance of counsel and newly discovered evidence.[3]

We affirm Gordon's conviction.

ZIMMERMAN, C.J., and RUSSON, J., concur in HOWE'S, J., opinion.

STEWART, Associate Chief Justice, dissenting:

I dissent.

The majority holds that appointed defense counsel's conflict of interest arising out of his position as a part-time city prosecutor is not reversible error although we held such a conflict to be per se reversible error in *State v. Brown*, 853 P.2d 851 (Utah 1992). The majority reaches its conclusion by reasoning that *Brown* should not be applied retroactively. I submit that the majority ignores precedent from both this Court and the United States Supreme Court that mandates reversal notwithstanding the issue of whether *Brown* itself should have retroactive effect. *Brown* was based on this Court's supervisory authority, but that case nevertheless implicated a defendant's Sixth Amendment right to counsel. Regardless of whether the specific holding in *Brown* is applicable, the Sixth Amendment issue is raised whenever a defendant's attorney has a conflict of interest; yet the majority barely discusses it. I also disagree with the majority's conclusion that

the holding in *Brown* is unavailing to Gordon. Because the issues underlying *Brown* are of a constitutional nature, the Supreme Court's holding in *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), requires this Court to follow the federal rule applying all judicial decisions retroactively. I would therefore hold that the judgment must be reversed.

### I. VIOLATION OF THE SIXTH AMENDMENT RIGHT TO COUNSEL

Whether our decision in *Brown* should apply retroactively is irrelevant to the central issue in this case. At the time of Gordon's and Brown's trials, this Court and the United States Supreme Court had already treated the issue of the impact of serious conflicts of interest upon a defendant's Sixth Amendment right to counsel and due process. Those decisions thus constituted established precedent before Gordon ever came to trial. In *State v. Brown*, 853 P.2d 851, 856–57 (Utah 1992), we chose not to address these constitutional issues. It is nevertheless clear that the Constitution is implicated in situations where defense counsel are also part-time prosecutors. Hence, if the majority here wishes to conclude that Gordon's trial was not constitutionally flawed, it cannot simply rely on the proposition that *Brown* is inapplicable because it was based on our so-called supervisory power rather than on the constitutional right to counsel itself. The Court must show that the Sixth Amendment and Due Process Clauses were not violated in this case, or that if they were violated the error is somehow harmless. Yet the majority opinion accords only the most cursory treatment to these unavoidable constitutional issues.

In doing so, the majority opinion notes, "We had the clear opportunity to enunciate such a [constitutional] holding in *Brown* but expressly refused to do so." This is true. In *Brown* we merely followed the principle that constitutional issues ought to be avoided when another basis for decision is available.

---

3. In *State v. Rawlings*, 829 P.2d 150, 154 (Utah Ct.App.1992), the court of appeals stated, "When resentencing takes place to allow a first appeal of right, as set forth in *Johnson*, this should not rule out the procedural possibility that post-convic-

tion motions may be appropriately heard in the sentencing court." Insofar as *Rawlings* departs from our analysis here and in *Hallett*, it is disavowed.

Because we reversed Brown's conviction on that other basis, constitutional analysis became superfluous—not because it was not pertinent to the issues raised, but because it could not influence the outcome. In this case, however, where the majority claims it can find no state law ground for reversal, the federal issues must, in that event, be addressed. The purported absence of a state law ground for decision does not make the federal ground magically disappear.

Before either Brown or Gordon came to trial, it was well established that "the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978) (quoting *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)). In that regard, the United States Supreme Court has held that where there is an unconstitutional conflict of interest, it will not "indulge in nice calculations as to the amount of prejudice arising from [the resulting] denial [of the assistance of counsel]." *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942); *see Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *Holloway*, 435 U.S. at 490, 98 S.Ct. at 1181; *see also Wood v. Georgia*, 450 U.S. 261, 271–72, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (holding same on due process grounds). Rather, prejudice will be presumed and the judgment reversed. This Court rendered

the same holding and adopted the same rule in *State v. Smith*, 621 P.2d 697, 699 (Utah 1980). In that case, one attorney represented two codefendants. One codefendant elected to plead guilty and testify against the other. Relying on *Holloway*, this Court held that such a conflict of interest required a per se reversal of Smith's conviction. *Id.*

Because *Glasser* and much of its progeny were cases in which the conflict of interest arose out of joint representation of multiple defendants and because such joint representation may actually be appropriate in certain cases, *Holloway*, 435 U.S. at 482–83, 98 S.Ct. at 1177–78 (stating that "certain advantages might accrue from joint representation"), the Supreme Court has required the factual predicate of an objection to a conflict of interest before the per se reversal rule may be invoked: "[A] defendant who raised no objection [to the conflict of interest] at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718.[1] In reference to the facts of Gordon's case, however, it is clear that it has never been appropriate for an appointed defense attorney to simultaneously function as a part-time city prosecutor.[2] *Brown* established that "it is clear that conflicts of interest inhere whenever a city prosecutor is appointed to represent an indigent defendant."[3] 853 P.2d at 858; *see also People v. Washington*, 101 Ill.2d 104, 77 Ill. Dec. 770, 772–74, 461 N.E.2d 393, 395–97 (applying per se reversal rule in case where

**1.** Prior to *Cuyler*, this Court held in *Smith*, " 'The law will not assume that counsel has advised his client of his inadequacies or those of his associates.'" 621 P.2d at 699 (quoting *Commonwealth v. Via*, 455 Pa. 373, 316 A.2d 895, 898 (1974)). Gordon was not informed of his attorney's conflict of interest and had no reason to suspect it. Arguably then, notwithstanding *Cuyler*, Gordon is entitled to application of the more lenient *Holloway* rule because he had no plausible reason for suspecting his attorney's conflict, whereas, in the *Cuyler* line of cases, the conflict was reasonably apparent even to the individual defendants.

**2.** The majority asserts that *Brown* was prophylactic in nature. A reading of that case, however, admits no such interpretation. The language proscribing the dual role of prosecutor and defender in *Brown* unequivocally asserts that the "vital interests of the criminal justice system are

jeopardized when a city prosecutor is appointed to assist in the defense of an accused." *Brown*, 853 P.2d at 856–57. If, as the majority now claims, retroactive application of *Brown* "would unjustly benefit many defendants," then it is difficult to understand why we elected in *Brown* to impose such a harsh consequence on appeal for conflicts of interest involving part-time prosecutors serving as defense counsel.

**3.** It should be noted that this particular point essentially served as a factual basis for this Court's legal conclusion setting forth the consequences of the self-evident conflict. Even assuming that the legal consequences of *Brown* (i.e., a per se reversal based on supervisory authority) are not "retroactively" applicable to Gordon's case, we are certainly entitled to rely on *Brown* as evidence establishing the factual predicate for a per se reversal pursuant to the constitutional grounds set forth in *Glasser* and its progeny.

part-time prosecutor acted as defense counsel), *cert. denied,* 469 U.S. 1022, 105 S.Ct. 442, 83 L.Ed.2d 367 (1984).[4] Yet the majority persists in asserting that the potential for prejudice arising from a conflict when "defense counsel ... has concurrent prosecutorial duties ... is much more remote" than the potential for prejudice arising out of a conflict due to "joint representation of multiple defendants." This assertion is supremely ironic because now under the law in Utah, concurrent representation of codefendants is permitted in appropriate circumstances, *see Holloway,* 435 U.S. at 482–83, 98 S.Ct. at 1177–78, while under no circumstances may a part-time prosecutor represent any criminal defendant anywhere. If *Brown* established anything, it is the principle that the factual predicate of an actual conflict of interest is always present when a part-time prosecutor acts as a defense attorney. *Brown,* 853 P.2d at 856–57, 859. A logical constitutional analysis requires that Gordon's conviction be reversed.

## II. APPLICABILITY OF RETROACTIVITY ANALYSIS

The majority also fails to recognize that *Brown* is applicable to this case even under

retroactivity analysis. Because *Brown* could have been decided on federal constitutional grounds, this Court is bound by the United States Supreme Court's decision in *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), which unequivocally held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with *no exception for cases in which the new rule constitutes a 'clear break' with the past.*" *Id.* (emphasis added). "The Supremacy Clause ... does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law."[5] *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, ——, 113 S.Ct. 2510, 2519, 125 L.Ed.2d 74 (1993).

The majority attempts to circumvent this mandate by noting that *Brown* was expressly based on our "supervisory power" and holding that when we invoke that power, "it is a clear indication that the decision will apply only to future cases."[6] Yet, as I have already pointed out, our choice of that analytical path cannot eliminate the underlying constitutional concerns. Under the majori-

---

**4.** It must be conceded that there is contra authority in other jurisdictions. *Mitchell v. Maggio,* 679 F.2d 77, 79–80 (5th Cir.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 222, 74 L.Ed.2d 176 (1982), held without any supporting citations that the Sixth Amendment does not require a per se reversal when a part-time city prosecutor acts as a defense attorney. The same circuit recently limited the applicability of the per se reversal rule to situations involving "multiple representation" despite a complete lack of any textual evidence that the Supreme Court intended to impose such a limitation. *Beets v. Scott,* 65 F.3d 1258, 1272 (5th Cir.1995). The Iowa Court of Appeals in *Bumgardner v. State,* 401 N.W.2d 211, 213–14 (Iowa Ct.App.1986), also declined to adopt a per se rule under the part-time prosecutor fact pattern. *Bumgardner,* however, virtually ignores pertinent constitutional authority in favor of policy reasoning avoiding the disqualification of all part-time prosecutors in rural counties where it would be difficult to appoint a defense attorney who did not have such a conflict of interest. In light of our holding in *Brown,* we can hardly employ similar policy reasoning in this case.

**5.** The majority claims that "even where we have adopted a new rule that is of constitutional dimension, we have been reluctant to give it retroactive effect." This assertion is incorrect. "In

the vast majority of cases, the stated law of a decision is effective both prospectively and retrospectively, even a decision which overrules prior law. Therefore, unless a substantial injustice would occur from retrospective application, we will apply a decision both prospectively and retrospectively." *Heslop v. Bank of Utah,* 839 P.2d 828, 835 (Utah 1992). In any event, *Griffith* and *Harper* make clear that we are not at liberty to be "reluctant" when it comes to affording retroactive effect to decisions of a "constitutional dimension."

**6.** The majority here misconstrues our prior precedent. For support, the majority relies upon dicta contained in a footnote in *State v. Menzies,* 889 P.2d 393, 406–07 n. 7 (Utah 1994). The *Menzies* majority, responding to my dissent in that case, briefly treated the issue of whether the holdings in *State v. Johnson,* 774 P.2d 1141, 1147–48 (Utah 1989) (Stewart, J., concurring in the result, joined by Zimmerman and Durham, JJ.) (invalidating inappropriate language in a jury instruction), and *State v. Ireland,* 773 P.2d 1375, 1380 (Utah 1989) (same), applied retroactively. The *Menzies* majority, apparently relying in part on the fact that the stated authority underlying *Johnson* and *Ireland* was our supervisory power, asserted that their holding applied only

ty's analysis, any time we face a constitutional issue, we can simply assert our supervisory authority as an alternate basis for decision and thereby render the ruling in *Griffith* a nullity when it comes time to address the retroactivity of the underlying case. Although *Harper* acknowledged the availability of differing retroactivity analysis on purely state law grounds, 509 U.S. at ——, 113 S.Ct. at 2519, I doubt seriously that the United States Supreme Court would permit the majority's subterfuge if a case such as Gordon's were brought before it on a writ of certiorari. The holding in *Brown* provides neither an independent nor an adequate state law ground for ignoring the requirements of *Griffith*. *Harper*, 509 U.S. at —— – ——, 113 S.Ct. at 2518–19.

Likewise, the majority's holding that *Brown* falls within one of the exceptions to the general rule of retroactivity that a "new rule governing criminal procedure [which] constitutes a clear break with the past" is also explicitly barred by *Griffith*. 479 U.S. at 328, 107 S.Ct. at 716. And even if we were at liberty to apply it, the policy reason behind it—refraining from punishing prosecutors post facto for violating procedural rules that were not in force at the time of trial—would not be present.[7] *Brown* did not establish a procedural rule constituting a clear break with the past. It merely dictated the consequences *on appeal* of a conflict of interest occurring in the trial court. Because it would have been prudent and reasonable to assume, even prior to *Brown*, that the appointment of defense counsel who was also a part-time city prosecutor within the same county could constitute an impermissible conflict of interest, *Brown* did not create any new procedural rules. If anything, given the available precedent which I have already dis-

cussed, courts should have been on notice that such a conflict could result in precisely the consequence ultimately dictated by *Brown*.

In sum, I submit that defendant is entitled to a reversal of his conviction and a new trial.

DURHAM, J., concurs in STEWART's, Associate C.J., dissenting opinion.

---

prospectively. That is nonetheless a far cry from holding that *all* decisions grounded in our so-called supervisory power—whatever that means apart from our appellate power—are ineligible for the retroactive application that is traditionally accorded to judicial decisions. *State v. Norton*, 675 P.2d 577, 583 (Utah 1983), *overruled on other grounds, State v. Hansen*, 734 P.2d 421, 427 (Utah 1986); *see also Heslop*, 839 P.2d at 835; *Malan v. Lewis*, 693 P.2d 661, 676 (Utah 1984).

7. The majority argues that applying the rule in *Brown* to this case will harm the "efficient ad-

ministration of justice." I disagree. Giving Gordon the benefit of this Court's ruling in *Brown* will cause no disruption of any significance in the criminal justice system. If there be other defendants who are incarcerated as a result of trials in which they were represented by part-time city prosecutors, their cases would have to come before the courts on writs of habeas corpus, and the rules of law that would apply under those circumstances are entirely different from the rule that should prevail here.